**UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,**

v.

**Keith Wayne QUINN, Defendant–Appellant–Cross–Appellee.**

Nos. 92–10452, 92–10509.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1994.

Decided March 17, 1994.

J. Frank McCabe, Goorjian & McCabe, San Francisco, CA, for defendant-appellant-cross-appellee.

Stephen L. Meagher, Asst. U.S. Atty., San Francisco, CA, for plaintiff-appellee-cross-appellant.

Before: SCHROEDER and NOONAN, Circuit Judges, and JONES,* District Judge.

* The Honorable Robert E. Jones, United States District Judge for the District of Oregon, sitting by designation.

SCHROEDER, Circuit Judge:

On September 5, 1991, a lone robber, wearing a dark mask and armed with a silver handgun, entered a bank in Berkeley, California, and took $24,625 from the bank's teller drawers. The robbery was styled a "takeover" robbery by the police because the robber went behind the teller counter and removed the money himself. Two weeks later, on September 19, 1991, at 10:30 a.m., two men entered a San Leandro, California bank dressed in dark clothing and wearing face masks. One of these men was armed with a silver handgun. As in the Berkeley robbery, the man with the gun went behind the teller counter and removed cash—$17,842—from the teller drawers.

During interviews by the police after the Berkeley robbery, four of the tellers described the robber as being 5'6" to 5'8" tall and weighing 140 to 165 pounds. After the San Leandro robbery, witnesses described the robber with the gun as being 5'3" to 6' tall and weighing 160 to 180 pounds. The San Leandro bank's customer service manager described the robber as being 5'9" tall, and weighing 170–175 pounds.

A witness on the street outside the San Leandro bank saw the robbers rolling up ski masks as they left the bank. The witness was interviewed by the police immediately after the robbery, and he told them that he saw the robbers drive away in a light blue Ford or Mercury. The witness also reported that he had seen the vehicle's license plate, and he told the police the tag number he had seen. The license number quickly was traced to a California woman who, within hours of the robbery, told the police that she had sold the car to appellant Keith Wayne Quinn and produced a bill of sale bearing Quinn's signature. The police recognized the name immediately, as Quinn was suspected of being connected to other "takeover" robberies in the area.

Because Quinn was the subject of investigation by the police, they already knew that he often stayed at his girlfriend's home in Oakland. Less than two hours after the San Leandro robbery, police officer Jeffrey Joanicot drove to the Oakland house and saw an Oldsmobile he knew to be one driven by Quinn in the driveway. Officer Joanicot also noticed, in the driveway, a blue Mercury bearing the plate number he knew matched the plate number observed by the witness at the San Leandro bank. Believing that Quinn was inside the house, the police watched the house. About forty-five minutes after the surveillance began, Quinn and another individual, Robert Stewart, exited the house and got into the Oldsmobile. The police stopped the car as it began to back out of the driveway. At gunpoint, Quinn and Stewart were told to lie on the ground and were handcuffed. The police conducted a pat-down search of both Quinn and Stewart, and discovered $1,480 in cash on Stewart. A plastic bag containing $5,380 was found on the front seat of the Oldsmobile.

The police sealed the Oakland house and stood guard until they could obtain a search warrant for the house and for the Mercury that was in the driveway. After obtaining warrants, the police searched the house and found a bag containing $9,060 in cash, including "bait bills" taken during the San Leandro robbery earlier that day. The police also discovered a loaded silver revolver and materials, including photographs and a pink slip for the Mercury, indicating that Quinn used the house as a residence. During a search of the Mercury, the police discovered several rounds of ammunition of the same caliber as the revolver found in the house. After transporting Quinn to the police station, the police discovered $356 in cash in the police car in which he had been traveling.

Quinn was charged with two counts of armed bank robbery and two counts of using a firearm during a crime of violence. This case was first tried in February 1992, resulting in a hung jury. The retrial, which is the subject of this appeal, began March 10, 1992. Quinn was convicted on all four counts.

Because Quinn had prior felony convictions for crimes of violence—second degree attempted robbery and robbery/assault with great bodily harm—he was sentenced as a career offender, pursuant to U.S.S.G. § 4B1.1, on the armed robbery counts. Under that section and under the Guidelines' sentencing scheme, Quinn's applicable guide-

line range on each bank robbery count was 262–327 months. The district judge sentenced Quinn to 262 months on each count, the sentences to run concurrently. The court imposed two, consecutive five-year terms for the firearm counts.

Quinn appeals his conviction and sentence, alleging that several errors were committed by the district court. The government brings a cross-appeal, contending that by statute, the trial court was required to impose a 240–month sentence, rather than a 60–month sentence, on the second firearm count. We affirm the convictions and vacate and remand for resentencing.

### The Lawfulness of the Arrest

■ Quinn first contends that the trial court erred in denying his motion to suppress evidence obtained by the police after they arrested Quinn without a warrant. He argues that the cash, gun, and ammunition seized during the search of the Oldsmobile, the Mercury, and the house all should have been suppressed because they were obtained after, and tainted by, an invalid arrest.

Quinn contends that the arrest was unlawful because the police did not have probable cause. "The test for probable cause is whether the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person to believe a suspect has committed … a crime." *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990). At the time that Quinn was arrested, the police knew him as a suspect in other "takeover" bank robberies. In addition, the police had discovered that the Mercury in which the San Leandro bank robbers had been traveling had been sold to Quinn and was present at the home of his girlfriend two hours after the robbery. When Quinn left the house, before the arrest, the police knew he was there as well. The district court did not err in concluding that a reasonable officer would have had grounds to believe that Quinn was criminally involved in the San Leandro robbery.

The inconsistencies of the witnesses' descriptions of the robber do not negate the probable cause. Here, unlike *United States v. Strickler*, 490 F.2d 378 (9th Cir.1974), there was evidence independent of the descriptions connecting the defendant to illegal activity. The police had evidence that a car owned by Quinn, and present with him at the time of arrest at the house where he stayed, had been used in a robbery that was similar to other robberies in which Quinn was a suspect. There was probable cause.

■ Citing *United States v. Alvarez*, 810 F.2d 879 (9th Cir.1987), Quinn alternatively argues that even if the police had probable cause, a warrant was nevertheless required. In *Alvarez*, this court held that a warrantless arrest, even if based on probable cause, is invalid if the arrest is made in a non-public place. In *Alvarez*, the non-public place was a hotel room. Cases subsequent to *Alvarez*, however, make it clear that no warrant is necessary for an arrest, made on probable cause, in a public place. *Hoyos*, 892 F.2d at 1393 (citing *United States v. Driver*, 776 F.2d 807, 809 (9th Cir.1985)). Quinn voluntarily left the house and was in plain view of officers watching the house from the street when he was arrested. Under *Hoyos*, no warrant was required for the arrest.

### The Admission of Photogrammetry Evidence

■ Quinn next contends that the district court erred in permitting the government's expert to testify to his use of "photogrammetry" to render an opinion as to the height of the individual in surveillance photographs from the Berkeley robbery. By analyzing two photographs, FBI Agent Douglas Goodin concluded and testified that the Berkeley robber was between 5′3″ tall and 5′6″ tall. Quinn is 5′5″ tall. To determines the Berkeley robber's height, Agent Goodin used a process in which a formula is derived by measuring the change in the dimensions of objects in a photograph as they move away from the camera. After testing the formula against objects of known dimensions in the photograph, Goodin was able to make an estimate of the robber's height.

■ Fed.R.Evid. 702 provides the appropriate standard for determining the admissi-

bility of expert scientific testimony.[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 embodies two primary criteria: a district court must determine whether proffered expert scientific testimony is relevant and reliable. *Id.* — U.S. at —, 113 S.Ct. at 2795. There is no dispute in this case as to relevance. The only issue is whether the district court erred in concluding that the process used by Goodin was scientifically valid and sufficiently reliable to be placed before the jury.

The court permitted Goodin to testify after a proffer from the government as to the basics of the photogrammetry process. During this proffer, counsel for the government explained that by using vanishing points, an analyst is able to measure the rate of change in the size of objects as they move away from a camera. Counsel explained that by referring to objects of known dimension in the photograph, an analyst can judge the size of other objects in the photograph. After hearing the government's proffer, the court concluded that the process used by Goodin was nothing more than a series of computer-assisted calculations that did not involve any novel or questionable scientific technique.

Quinn contends that he was entitled to a full evidentiary hearing on the reliability of the process used by Agent Goodin. We cannot conclude that the court abused the discretion trial courts must exercise in choosing the best manner in which to determine whether scientific evidence will assist a jury. *Daubert,* — U.S. at —, 113 S.Ct. at 2796. Quinn points to nothing in the record calling the reliability of the photogrammetry process into question. Moreover, he was permitted to cross-examine the government's expert as to the specifics of the process, the techniques he used, and the witness's qualifications to give his findings. The court gave Quinn the opportunity to call his own photogrammetry expert, which he did not do—although he had an expert in the courtroom during the government expert's testimony. The district court did not err in admitting this evidence.

### Sufficiency of the Evidence

■ Quinn contends that the evidence was insufficient to support his conviction on counts one and two—the counts relating to the robbery of the Berkeley bank. In reviewing the sufficiency of the evidence, this court must determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found Quinn guilty beyond a reasonable doubt. *United States v. Orozco–Santillan,* 903 F.2d 1262, 1264 (9th Cir.1990) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

There was direct evidence tying Quinn to the Berkeley robbery. First, as agent Goodin's testimony established, the robber was approximately Quinn's height. In addition, the gun used in the Berkeley robbery, as identified by experts from surveillance photographs, is similar to the gun found in the home of Quinn's girlfriend on the day that Quinn was arrested. Ammunition for this type of weapon was found in Quinn's car. Government experts testified that the model of the gun was observable from the surveillance photographs, as were modifications made to the gun's grip and barrel, greatly increasing the likelihood that the gun found at the home of Quinn's girlfriend was the same gun that was used in the Berkeley robbery.[2]

In addition, and equally important, there was evidence that the man who committed the San Leandro robbery also committed the Berkeley robbery. Both robbers were of similar height, dressed similarly, used similar

---

**1.** Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**2.** The government also notes that a witness from the Berkeley bank tentatively identified Quinn from a lineup by marking a witness identification card with a question mark. The reliability and probative value of this identification is difficult to judge on the record before the court. We find that the evidence supporting Quinn's conviction was sufficient without this identification, and, accordingly, find that reliance on this identification is not necessary.

robbery styles, and used a similar gun with similar modifications. There was abundant evidence that Quinn committed the San Leandro robbery: his car was used in the robbery and bait bills from the robbery were found at his girlfriend's house, where Quinn himself was arrested soon after the robbery.[3] The jury, presented with sufficient evidence that Quinn had committed the San Leandro robbery, *and* with evidence that the man who committed the San Leandro robbery also committed the Berkeley robbery, reasonably could have found that Quinn was the Berkeley robber.

█ Quinn argues that evidence connecting him to the San Leandro robbery was inadmissible under Fed.R.Evid. 404(b) to show that he committed the Berkeley robbery. Undoubtedly, evidence that Quinn robbed the San Leandro bank could not have been admitted to show that he robbed the Berkeley bank if offered only to establish that Quinn was prone to bank robbery or to show that because he robbed the San Leandro bank, robbery of the Berkeley bank was in his character. However, evidence of other bad acts is admissible under Rule 404(b) if it is offered for some relevant purpose, other than character, such as motive, opportunity, intent, preparation, plan, knowledge, or identity. Fed.R.Evid. 404(b); *see United States v. Bailleaux*, 685 F.2d 1105, 1109 (9th Cir. 1982). The government correctly argues that in light of significant similarities between the two robberies, evidence from the San Leandro robbery was offered to show, and was relevant to, the *identity* of the Berkeley robber; it was not relevant only to character.

█ Evidence that a person has committed one crime is not admissible to show the identity of the person committing another crime merely because the two offenses are similar. The offenses must be so similar in their circumstances as to guarantee a reasonable likelihood that they were committed by the same person. *See Featherstone v. Estelle*, 948 F.2d 1497, 1501–02 (9th Cir.1989); *Drew v. United States*, 331 F.2d 85, 90

(D.C.Cir.1964). Otherwise, the possibility that the jury will draw improper conclusions as to the accused's character is too great to allow admission of the evidence, notwithstanding its marginal probative value. The robber of the Berkeley and San Leandro banks had a sufficiently distinct "signature" to make evidence of each robbery relevant and reliable to show the identity of the perpetrator of the other. *United States v. Johnson*, 820 F.2d 1065, 1070–71 (9th Cir. 1987) (defendant's connection to one robbery admissible to show that he committed another where robber used similar technique, dressed distinctly, and demonstrated a sophisticated knowledge of bank security measures in both robberies). The robberies for which Quinn was charged were both "takeover" robberies, featured a man of Quinn's approximate size and dress brandishing a weapon, and were close to each other in time and location. In addition, and the most significant evidence that the robberies were committed by the same person, a similar weapon, as specially modified and later identified by experts, was used in both robberies and was found at the home at which Quinn was arrested. Evidence that Quinn committed the San Leandro robbery was admissible under Rule 404(b) to show that he committed the Berkeley robbery, and with it, there was sufficient evidence to support the convictions on counts one and two.

### Severance

█ Quinn contends that the district court erred in denying his motion to sever the trials on the two bank robbery counts and the corresponding firearm counts. As this circuit has previously noted with respect to the practice of trying separate counts together in one trial, "if all the evidence of [a] separate count would be admissible upon severance, prejudice is not heightened by joinder." *Johnson*, 820 F.2d at 1070. As already determined, evidence from the San Leandro robbery was admissible to show the identity of the Berkeley robber and could have come in even if the trials were severed.

---

3. In fact, Quinn does not challenge the San Leandro robbery conviction on sufficiency of the

evidence grounds.

Accordingly, the district court's denial of Quinn's severance motion must be affirmed.

### Sentencing Issues

■ Quinn attacks his sentence, arguing that he was improperly sentenced as a career offender. Under U.S.S.G. § 4B1.1, a defendant is a career offender if

(1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

The trial court found that Quinn had two previous qualifying felony convictions.

Quinn challenges the district court's inclusion of a 1976 conviction in California for attempted robbery and assault with great bodily harm. Quinn was sixteen years old at the time of this offense, and he argues that his conviction does not qualify as a prior violent felony conviction under the Guideline.

■ Pursuant to the application notes to the Guidelines, "prior felony conviction," as used in § 4B1.1, is defined to mean:

a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed.... A conviction for an offense committed prior to age eighteen is an adult conviction *if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted.*

U.S.S.G. § 4B1.2, Application Note 3 (emphasis added). Under the Guidelines, a conviction qualifies as a prior felony conviction, regardless of whether the defendant has actually served one year and regardless of the fact that the period of imprisonment was indeterminate, if the maximum sentence *imposed* exceeds one year and one month. *United States v. Carrillo,* 991 F.2d 590, 592–93 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993). There is no dispute in this case that Quinn was tried as an adult for the 1976 offense and that he was sentenced to twenty months. Accordingly, the 1976 conviction falls squarely within the definition of prior felony conviction in § 4B1.2, Note 3. *See Carrillo,* 991 F.2d at 593.

■ Quinn contends, however, that reference to Application Note 3 to enhance the punishment for offenses committed prior to its addition to the Guidelines violates ex post facto principles. This court previously has held that Note 3 does not substantively alter any Guideline provision, but merely clarifies the meaning of the career offender provisions. *Carrillo,* 991 F.2d at 591–92. Moreover, Note 3 was added to the guidelines well *before* Quinn was sentenced. In *Carrillo,* the court ruled that because Note 3 merely clarifies the career offender provisions, it may be considered in reviewing a sentence imposed even before the Note was added to the Guidelines. *Id. A fortiori,* the Note can be considered in reviewing a sentence imposed after its addition. Because Quinn was convicted of two offenses, as an adult, carrying sentences in excess of one year and one month, he was properly sentenced as a career offender.

■ On the government's cross-appeal, we must hold that the district court erred in failing to sentence Quinn to twenty years for his conviction on the second use of a firearm count. Since Quinn was sentenced, the Ninth Circuit and the Supreme Court both have held that convictions on two counts of use of a firearm under § 924(c), even if charged in the same indictment, trigger the twenty-year mandatory minimum. *Deal v. United States,* —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); *United States v. Neal,* 976 F.2d 601 (9th Cir.1992). Under *Neal* and *Deal,* the trial court's failure to impose a twenty-year sentence on count 4 was error.

The convictions are AFFIRMED. The sentence of 60 months on the second firearm conviction is REMANDED FOR IMPOSITION of a 240–month sentence. The judgment and sentence otherwise are AFFIRMED.