UNITED STATES of America,
Plaintiff–Appellee,

v.

Billy CRUZ, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Joey MESA, Defendant–Appellant.

Nos. 96–10159, 96–10160.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1997.

Decided Sept. 19, 1997.

Benjamin B. Cassiday, III, Honolulu, HI, for defendant-appellant Cruz.

Richard T. Pafundi, Honolulu, HI, for defendant-appellant Mesa.

Steven S. Alm, United States Attorney, Thomas J. Brady, Assistant United States Attorney, Honolulu, HI, for plaintiff-appellee.

Before: NORRIS, HALL, and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Billy Cruz and Joey Mesa appeal from their convictions for conspiracy to distribute methamphetamine and possession with intent to distribute. 21 U.S.C. §§ 846, 841(a). Cruz also appeals his conviction for attempting to possess methamphetamine with intent to distribute. The district court had jurisdiction under 18 U.S.C. § 3231; we have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part and remand.

## FACTUAL BACKGROUND

Mesa hired Peter Balajadia to carry 210.7 grams of methamphetamine from California to Guam in a pouch sewn into his underwear. In exchange, Balajadia was to be paid $1,500 and two small packets of methamphetamine. Mesa instructed Balajadia to deliver the drugs to Jaime Tenorio in Guam. Balajadia flew from San Francisco to Honolulu on his way to Guam, accompanied by Robert Taitano. Unfortunately for the conspirators, an anonymous tipster had informed Honolulu police detectives that Balajadia would be carrying methamphetamine on the flight. The detectives questioned Balajadia, conducted a consensual search, and found the methamphetamine. After Balajadia and Taitano were arrested, Balajadia agreed to cooperate with the government.

Balajadia initially told the detectives that Taitano had hired him to carry the drugs to Guam. He later admitted that he had lied in

an effort to protect Mesa, his sister's fiance. A detective had Balajadia call Tenorio in Guam and tell him that Taitano had been arrested with Balajadia's ticket after drinking too much on the plane and getting in a fight. Balajadia claimed that he did not have enough money to get to Guam and deliver the drugs. Tenorio told Balajadia that either he or "Joey" would come to Honolulu and get the drugs.

Later that evening and after several phone calls between Balajadia, Mesa, and Tenorio, Mesa called Balajadia and informed him that Cruz would come to Honolulu and take the drugs to Guam. Cruz, Balajadia's cousin, agreed to transport the drugs in exchange for $3,000. Cruz then told Balajadia that he was coming and not to flush the drugs down the toilet. The next day, the detectives monitored and videotaped Cruz attempting to take possession of the methamphetamine (actually replaced by rock salt) from Balajadia. The officers found about one-half gram of methamphetamine on Cruz and plastic bags commonly used to hold small amounts of drugs, as well as the rock salt.[1]

## DISCUSSION

## I.  CRUZ'S MOTION FOR JUDGMENT OF ACQUITTAL

◼ Cruz moved for a judgment of acquittal after the government completed its case-in-chief and again after the close of evidence. The trial court denied both motions. The district court's rulings are reviewed de novo. *United States v. Bahena–Cardenas,* 70 F.3d 1071, 1072 (9th Cir.1995). We must review the evidence in the light most favorable to the government and decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins,* 40 F.3d 1055, 1057 (9th Cir.1994) (internal quotation omitted).

---

1. The dissent contends that "[h]ad the authorities not intervened, Cruz would have flown to Guam and delivered the drugs." This contention, as we shall demonstrate, entirely misses the point: The

authorities intervention terminated the conspiracy and, "had the authorities not intervened," Cruz would not have become involved at all.

## A. Duration of the Conspiracy

### 1) Conspiracy Count, 21 U.S.C. § 846

██ The most difficult issue on this appeal arises from Cruz's claim that the conspiracy had concluded by the time he became involved. A conspiracy is deemed to continue "until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy." *United States v. Castro*, 972 F.2d 1107, 1112 (9th Cir.1992). Cruz contends that the conspiracy for which he was convicted had concluded by the time he became involved-its objective had been defeated. The government does not dispute that Cruz was not involved at the conspiracy's inception and did not become involved until after Balajadia, who was already in custody at the time, called him from Hawaii, at which point Cruz agreed to take the drugs to Guam. At that time, the government had already seized the drugs and arrested Balajadia. Cruz contends that the object of the conspiracy-transportation of methamphetamine to Guam-was defeated when the drugs were seized and Balajadia and Taitano were arrested. On the other hand, the government contends that one may join a conspiracy already formed and that the conspiracy had not ended when Cruz became involved. We reject the government's contention and decline to extend liability for conspiracy to these facts. Under *Castro*, "the object of the conspiracy [had been] defeated." *Id.*

The government relies on *United States v. Bibbero*, 749 F.2d 581 (9th Cir.1984), for the assertion that Cruz could join a conspiracy already in existence and be bound by the activity that has already taken place. How-

ever, *Bibbero* is clearly distinguishable. There, the defendant, although not involved in the conspiracy's first four marijuana smuggling operations, helped plan the fifth and sixth operations and acted as a supplier and distributor of the marijuana.[2] *See id.* at 588. The court noted that the defendant's responsibilities placed him at the core of the conspiracy during those two operations and, thus, it was reasonable for the jury to find that he was a member of the overall conspiracy. *Id.*

Here, the conspiracy-to distribute methamphetamine and to possess with intent to distribute-had been terminated by the government's seizure of the methamphetamine before Cruz became involved. Analogizing to the "last act" of payment for already-delivered cocaine in *United States v. Mason*, 658 F.2d 1263, 1269–70 (9th Cir.1981), the government contends that the conspiracy was still ongoing because Cruz had yet to be paid for transporting the methamphetamine. However, *Mason* is distinguishable.

First, *Mason* involves statements by a conspirator, Johns, made after the arrest of the other members of the conspiracy, not the liability of a person *recruited after* the arrest had occurred. At the time Johns made the statement implicating Mason, Johns had not yet been arrested and Mason was clearly already involved in the conspiracy. Indeed, liability for the original conspiracy on the basis posited by the government could be endless.[3] While Cruz may have attempted to deliver the methamphetamine to Guam, it is more reasonable to characterize his behavior as part of a new conspiracy with Mesa, rather than part of the original conspiracy.[4]

---

2. Similarly, in *United States v. Knight*, 416 F.2d 1181 (9th Cir.1969), *quoted in Bibbero*, 749 F.2d at 588, there was evidence of the appellant's active participation in the conspiracy on several occasions, even though he was not involved at its inception.

3. It is not difficult to picture Balajadia sitting in the Honolulu Airport Police Station with a copy of the Guam telephone directory in hand, following the detectives' instructions to call all of his acquaintances in Guam to come to Honolulu to help him.

4. Cruz may well have been a member of *some other* conspiracy, but it was not the conspiracy

charged in the indictment. The First Superseding Indictment charged a five-member conspiracy of Balajadia, Taitano, Tenorio, Mesa and Cruz. However, it was factually impossible for Cruz to have been a member of that conspiracy because Balajadia and Taitano had been arrested and the drugs seized before he was even invited to join. Thus, at most, Cruz may have been a member of a *new* conspiracy between himself, Mesa and Tenorio. However, that conspiracy was not charged in the indictment. *Cf. United States v. Arbelaez*, 719 F.2d 1453, 1457 (9th Cir. 1983) (evidence is insufficient to prove single overall conspiracy charged in indictment if proof at trial establishes multiple conspiracies); *see*

Second, in *Mason*, the "last act of the conspiracy" the court referred to was payment for cocaine which Mason had already delivered.[5] 658 F.2d at 1270. While a conspiracy may continue when payment is sought for already-delivered contraband, it extends conspiracy liability beyond reasonable limits to say the conspiracy continues when the product has not yet been delivered, can no longer be delivered, and all that remains is for a new recruit to be paid for his part in the delivery. Payment of the new recruit-courier for his part in the delivery of the drugs is not an object of the conspiracy; use of a courier to deliver the drugs is merely one of the means used to carry out the conspiracy's objectives.[6]

We therefore find that the evidence was insufficient for any rational jury to have found beyond a reasonable doubt that the conspiracy was still in existence at the time Cruz became involved. His conviction for conspiracy must be reversed.[7]

### 2) Possession Count, 21 U.S.C. § 841(a)(1)

█ Cruz was convicted for possession under a *Pinkerton* theory of liability, under which his co-conspirators' possession of the methamphetamine was imputed to him. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (conspirator can be convicted of co-conspirators' substantive offenses if committed in furtherance of conspiracy); *United States v. Hegwood*, 977 F.2d 492, 498 (9th Cir.1992). He is liable for any underlying substantive offenses committed by co-conspirators while he was a member of the conspiracy. However, Cruz "cannot be held liable, for substantive offenses committed before joining ... [the] conspiracy." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir.1992) (citing *Levine v.*

---

also *Kotteakos v. United States*, 328 U.S. 750, 773–74, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).

**5.** The conspiracy in *Mason* was for the sale of several pounds of cocaine. After delivery of the "first installment," three conspirators were arrested. 658 F.2d at 1268. The government, wishing to apprehend the source of the cocaine, secured the cooperation of one of the conspirators. Johns, unaware of the arrests, had Mason make another delivery, after which Mason and Johns were arrested. Thus, while there were planned future deliveries, Mason was clearly part of the original conspiracy. *See id.* at 1268–70. In discussing whether the conspiracy was terminated by the arrests of the other conspirators, the court noted that the objectives of the conspiracy remained to be met, and said that "[e]ven if the conspiracy were limited to the sale of just the eight ounces, Johns, at the time he made the statement had not received payment which would have been the last act of the conspiracy...." *Id.* at 1270.

**6.** The government also relies on *United States v. Taylor*, 802 F.2d 1108 (9th Cir.1986), *United States v. Saavedra*, 684 F.2d 1293 (9th Cir.1982), and *United States v. Testa*, 548 F.2d 847 (9th Cir.1977), but these cases are equally unhelpful. All of them involve the admission of co-conspirator statements after the arrest of one or more members of the conspiracy, but none involves attempting to place conspiracy liability on one who was newly-recruited after the arrest had occurred.

The dissent relies on *United States v. Walker*, 653 F.2d 1343, 1350 (9th Cir.1981), and other

cases which hold, for statute of limitations purposes, that a conspiracy continues until its "secondary" objective, receipt of the economic benefit of the illegal activity, is accomplished. We have no quarrel with those cases. We do, however, disagree with the dissent's extension of those cases to the facts of this case. The dissent does so by implicitly classifying Cruz's receipt of payment in exchange for transportation as a "secondary objective" of the conspiracy. However, paying Cruz, unlike the receipt of profits, was never an objective of the conspiracy. Use of a courier-Balajadia and, presumably, Cruz-to transport the drugs to Guam was a *means* by which the objective of the conspiracy was sought to be accomplished, and was not itself an objective. Thus, the conspiracy had ended when *all* of its objectives had been defeated by the arrest of Balajadia and Taitano and seizure of the drugs being transported by them.

*Walker* also makes clear that the "additional objectives" it refers to are limited to those *contemplated by the original agreement*, and do not include new objectives created after the main objective of the conspiracy has been frustrated. *Id.* ("Where ... the *conspirators originally agreed* to take certain steps after the principal objective of the conspiracy was reached, ... the conspiracy may be found to continue.") (emphasis added) (quoting *United States v. Hickey*, 360 F.2d 127, 141 (7th Cir.1966)).

**7.** This disposition of the conspiracy charge against Cruz makes it unnecessary for us to reach his contention that the trial court erred in limiting the scope of his closing argument, precluding Cruz from arguing that the conspiracy had ended by the time he became involved.

United States, 383 U.S. 265, 266, 86 S.Ct. 925, 925, 15 L.Ed.2d 737 (1966)).

Because we hold that Cruz's conspiracy conviction must be reversed, he cannot be held liable for the substantive offense under a *Pinkerton* theory. Even assuming, however, that Cruz was a conspirator, he did not join any conspiracy until *after* the methamphetamine was seized by the government. Therefore, he cannot be held accountable for its earlier possession by his co-conspirators. Accordingly, we reverse his conviction for possession.

#### 3) *Attempt Count, 21 U.S.C. §§ 841(a), 846*

■ Cruz's conviction for attempted possession rested upon his meeting with Balajadia and taking from him the rock salt/methamphetamine to transport it to Guam. *See United States v. Steward,* 16 F.3d 317, 320 n. 4 (9th Cir.1994) (defendant can be convicted of attempt to distribute even when substance offered for sale is noncontrolled substance). Cruz conceded the essential elements of attempted possession when he testified in an effort to show he was entrapped. This count rests upon uncontested facts and is independent of the conspiracy and *Pinkerton* possession counts.

#### 4) *Disposition*

■ Our reversal of the conspiracy and possession counts requires a remand for re-sentencing. We have reversed two of the three counts of conviction for which Cruz was sentenced to 63 months' imprisonment, concurrent on all counts. Not only was Cruz given the lowest possible sentence, the court invoked the "safety valve" provision, 18 U.S.C. § 3553(f)(1)–(5), to reduce his sentence even further. This record, thus, suggests that the district court regarded the sentences on the three counts as parts of a single "sentencing package." In these circumstances, the district court should have the opportunity to reconsider Cruz's sentence on the affirmed count. *See United States v. Corona,* 34 F.3d 876, 882 (9th Cir. 1994) (remanding for resentencing where court reversed convictions on substantive counts and affirmed on conspiracy count);

United States v. Ritter, 989 F.2d 318, 323 (9th Cir.1993) (remanding for resentencing after reversal of conspiracy count and affirmance of substantive counts); *United States v. Jenkins,* 884 F.2d 433, 441 (9th Cir.1989) (appropriate to remand for resentencing on unchallenged count where district court may have "regarded the sentence on the two counts as part of a single 'sentencing package.'") (citing *United States v. Pinkney,* 551 F.2d 1241, 1246 n. 37 (D.C.Cir.1976) ("Where the appellate court could only speculate as to what sentence the trial court would have imposed absent consideration of a count upon which the conviction or sentence is later vacated, a remand for resentencing on the remaining, valid counts is appropriate.")).

### B. Cruz's Entrapment Defense

■ Cruz contends that the district court committed error when it rejected his argument that he was entrapped as a matter of law. We review the trial court's ruling on the entrapment defense de novo. *United States v. Lorenzo,* 43 F.3d 1303, 1305 (9th Cir.1995). Usually, the jury decides whether a defendant was entrapped. To succeed in claiming entrapment as a matter of law, Cruz must point to undisputed evidence establishing that: (1) he was induced to commit the crimes; and (2) he lacked the predisposition to do so. *Id.*

#### 1) *Inducement*

■ Cruz must present *"undisputed evidence* making it patently clear that an otherwise innocent person was induced to commit the illegal act." *Lorenzo,* 43 F.3d at 1305 (emphasis in original) (internal quotes omitted). Inducement results from government conduct creating a substantial risk that an otherwise law-abiding person would commit a crime. Possible inducing conduct includes: "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Davis,* 36 F.3d 1424, 1430 (9th Cir.1994).

■ While Cruz testified that he went to Hawaii in order to help his cousin and friend Balajadia for personal reasons, it was Mesa,

not Balajadia, who persuaded Cruz to do so by pointing out that Balajadia was in trouble and by offering Cruz $3,000. Nothing in the recorded conversations indicates that Balajadia attempted to induce Cruz to come; in fact, Balajadia tried to discourage Cruz's participation when he spoke with Mesa. Since Mesa was not a government agent, the government did not directly induce Cruz to become involved. At most, the government indirectly promoted a fraudulent representation by having Balajadia pretend he was stranded in Honolulu. The evidence also suggests that Cruz was not an "otherwise innocent person." In addition to personally using methamphetamine, Cruz had sold it before and was in possession of distribution paraphernalia (plastic baggies) when he was arrested. It is far from undisputed that Cruz was wrongfully induced to commit the crime.

### 2) Predisposition

■■■■■ In deciding whether Cruz was predisposed to commit the crime, we consider five factors: (1) Cruz's character and reputation; (2) whether the government made the initial proposal of criminal activity; (3) whether Cruz engaged in the activity for profit; (4) whether Cruz showed any reluctance; and (5) the nature of the government's inducement. *United States v. McClelland,* 72 F.3d 717, 722 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996). While none of the five factors controls, the most important is any reluctance Cruz may have demonstrated. *Davis,* 36 F.3d at 1430.

The first three factors weigh in favor of finding that Cruz was predisposed to commit the crimes. First, the evidence showed that Cruz intermittently used methamphetamine, including on the day he was arrested, and that he had sold methamphetamine to others in the past. While there was no evidence that he had previously transported large amounts of drugs, his history of drug transactions indicates a character and reputation for engaging in illegal drug activity. Second, the government did not propose Cruz's involvement. Instead, Mesa asked Cruz to go to Hawaii and transport the drugs to Guam.

Third, Cruz agreed to transport the drugs in exchange for $3,000.

The remaining two factors weigh against a finding of predisposition. As to the fourth factor, Cruz testified that he was reluctant when Mesa asked him to transport the drugs. However, this testimony was not corroborated and his recorded conversations with Balajadia show no such reluctance. The evidence of reluctance is not very strong. Finally, the nature of the inducement involved both a personal factor and a financial factor: Cruz sought to help his cousin out of a difficult situation, but he also was paid for his efforts. In sum, these two factors weigh in Cruz's favor to some extent, but as a whole he cannot show a lack of predisposition. We therefore reject Cruz's claim of entrapment as a matter of law.

## II.   MESA'S MOTION TO SEVER

■■■■ Mesa challenges the district court's denial of his motion to sever his trial from his codefendants' trial, citing the admission of evidence that the jury would not have heard if he had been tried alone, as well as mutually antagonistic defenses. The district court's denial of Mesa's motion to sever is reviewed for abuse of discretion. *United States v. Matta–Ballesteros,* 71 F.3d 754, 770 (9th Cir. 1995), *as amended,* 98 F.3d 1100 (9th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997).

■■■■■ Under Federal Rule of Criminal Procedure 14, the court may sever the trial of one defendant from another to prevent prejudice, even where joinder was appropriate under Federal Rule of Criminal Procedure 8(b). However, the party seeking reversal of a court's denial of a motion to sever must meet a heavy burden. "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Baker,* 10 F.3d 1374, 1386 (9th Cir.1993). Severance should be granted only if a serious risk exists that a joint trial would compromise a particular trial right of a properly joined defendant or prevent the jury from reliably determining guilt or innocence. *Zafiro v. United*

*States,* 506 U.S. 534, 538, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993).

### A. Prejudice From Evidence Admissible Only Against Other Defendants

■ In assessing prejudice, we must consider "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility." *United States v. Freeman,* 6 F.3d 586, 598 (9th Cir.1993). A joint trial was particularly appropriate here because the defendants were charged with conspiracy. *Id.* As a result, nearly all the admitted evidence would have been admissible against Mesa even if he had been tried alone, including the critical tape recordings between Balajadia and the co-conspirators. *See United States v. Mkhsian,* 5 F.3d 1306, 1312 (9th Cir.1993) (defendant not prejudiced during joint trial by admission of co-conspirators' statements since they would have been admissible in separate trial under Fed.R.Evid. 801(d)(2)(E)).

■ As Mesa points out, however, two pieces of evidence were not admissible against him. First, Mesa complains that his defense was prejudiced when the jury heard Officer Garcia's testimony concerning Cruz's predisposition to commit the crime, which was introduced to rebut Cruz's entrapment defense. But the jury could reasonably be expected to compartmentalize that evidence and limit its consideration to Cruz, since he was the focus of the testimony. Moreover, the trial court instructed the jury to consider the evidence only as it related to Cruz's entrapment defense. Officer Garcia did refer to Mesa's role in a drug transaction with Cruz despite the court's and the government's efforts to avoid any mention of Mesa. In light of the trial court's immediate instruction to disregard Garcia's reference to Mesa, that portion of the testimony was not unduly prejudicial.

■ Second, Mesa complains about the rebuttal testimony of government witness Detective Nazarchyk, elicited in response to Taitano's cross-examination of Nazarchyk. In that testimony, Nazarchyk described Tenorio's statements after his arrest, which implicated both Mesa and Taitano. Nazar-

chyk's testimony was inadmissible against Mesa under Fed.R.Evid. 801(d)(2)(E) since it repeated statements that Tenorio had made after his arrest and not in furtherance of the conspiracy. But the testimony was cumulative since Tenorio himself testified at great length about the conspiracy and Mesa's role in it. *See United States v. Sherlock,* 962 F.2d 1349, 1363 (9th Cir.1989). In addition, Mesa did not object to the admission of Nazarchyk's testimony or seek a limiting instruction. Nazarchyk's testimony did not unduly prejudice Mesa's defense.

### B. Prejudice From Mutually Antagonistic Defenses

■ Mesa also argues that his defense could not be reconciled with the defenses of Taitano and Cruz. A defendant is entitled to severance based upon mutually antagonistic defenses only if "the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton,* 87 F.3d 1069, 1072 (9th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 993, 136 L.Ed.2d 874 (1997).

Mesa's attorney presented a defense theory of reasonable doubt. He focused on the government witnesses' lack of credibility: "If you don't believe anybody .... [y]our remedy is to acquit Joey Mesa ... you have no way of assessing the truth here in this case." Mesa's attorney did note that Balajadia had first implicated Taitano rather than Mesa as the source of the drugs, but he also suggested that Balajadia himself could have been the source. His central theme was that because the government's witnesses lacked credibility, the jury could not determine what had actually happened and the government had not proven its case.

Taitano's defense was that he was an innocent bystander with no active involvement in the drug conspiracy. His testimony did indicate that Mesa was involved in the conspiracy. Taitano testified that he happened to travel with Balajadia, an acquaintance, after Mesa asked him to accompany Balajadia.

According to Taitano, Mesa first said that Balajadia was going on a vacation but eventually admitted that Balajadia would be carrying drugs. Taitano's attorney argued that Mesa was involved in the conspiracy, while Taitano was an innocent bystander. However, his central argument was that Balajadia was a liar whose implication of Taitano could not be trusted.

Cruz admitted his role in the scheme and presented an entrapment defense. He testified that Mesa persuaded him to get involved by telling him that his cousin was in trouble, offered him $3,000 to take the drugs to Guam, and gave him money for the plane ticket. Cruz's attorney also emphasized Mesa's role in the conspiracy during closing argument.

While these defenses are antagonistic, at their cores they are not irreconcilable. The jury could have accepted Taitano's claim that he was an innocent bystander and still found that the case against Mesa had not been proven beyond a reasonable doubt. Similarly, it could have found that Cruz was entrapped and also that insufficient evidence supported Mesa's conviction. None of the attorneys argued that the jury had to find one defendant guilty in order to acquit another. *See United States v. Buena–Lopez,* 987 F.2d 657, 661 (9th Cir.1993). The district court also reduced any potential confusion between the defendants by instructing the jury that it should evaluate the evidence against each defendant separately and that the verdict as to one defendant should not control the verdicts of the others. *See Zafiro,* 506 U.S. at 540–41, 113 S.Ct. at 938–39. Finally, Mesa fails to show how Taitano's and Cruz's damaging testimony implicating him would have been inadmissible against him if their trials had been severed. *See Throckmorton,* 87 F.3d at 1072; *United States v. Arias–Villanueva,* 998 F.2d 1491, 1507 (9th Cir.1993).

Mesa relies upon *United States v. Tootick,* 952 F.2d 1078 (9th Cir.1991), the only case from the Ninth Circuit in which we held that a joint trial should have been severed due to mutually antagonistic defenses. In *Tootick,* two defendants were charged with stabbing the victim, and only the two defendants were present at the time of the stabbing. Each defendant argued that the other alone committed the assault. The court concluded that severance was necessary because "[e]ach defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other." 952 F.2d at 1081. In this case, though, the crime involved many participants in different places who committed numerous acts in furtherance of the conspiracy. An acquittal of Taitano or Cruz would not have necessitated Mesa's conviction. Their defenses were not so mutually antagonistic as to result in undue prejudice.

In sum, the district court did not abuse its discretion by ordering a joint trial.

## III. ADMISSION OF EXPERT TESTIMONY

Mesa and Cruz challenge the admission of testimony from expert witness Lionel Tucker, a forensic chemist employed by the Drug Enforcement Administration. Tucker had conducted an analysis of the identity and purity of the substances recovered from Balajadia and Cruz. Cruz and Mesa contend that the government failed to meet the test for admitting expert scientific testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We review the admission of expert testimony for abuse of discretion. *Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 597 (9th Cir.1996).

Under Federal Rule of Evidence 702, scientific knowledge that "will assist the trier of fact ... to determine a fact in issue" is admissible through the testimony of "a witness qualified as an expert by knowledge, skill, experience, training, or education," who "may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. In *Daubert,* the Supreme Court explained that trial courts must determine whether the expert will testify about scientific knowledge that will be helpful to the trier of fact. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Dau-*

*bert*, 509 U.S. at 592–93, 113 S.Ct. at 2796–97. The court proposed several nonexclusive factors for trial courts to consider: (1) whether the method has been generally accepted in the relevant scientific community; (2) whether the theory or technique has undergone peer review and publication; (3) whether the method can be, or has been, tested; (4) whether standards controlling the technique's operation are maintained; and (5) whether there exists a known or potential rate of error. *Id.* at 594, 113 S.Ct. at 2797; *see also United States v. Jones,* 24 F.3d 1177, 1179 (9th Cir.1994).

■■■ Cruz and Mesa attack the government's efforts to identify the methods Tucker used and to show that those methods were scientifically valid. While the government's attempt to comply with *Daubert* was not a model of clarity, Tucker explained sufficiently which tests he used, that they were accepted in the scientific community and that they had been subject to peer review. Tucker's testimony was properly presented to the jury, which was in a position to consider any deficiencies in it.

More generally, appellants complain that the government did not elicit testimony on each of the *Daubert* factors. But it did not necessarily have to do so. The factors in *Daubert* were not intended as a "definitive checklist or test." *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. Instead, they were intended to guide the trial court in determining whether the testimony was "scientifically valid." *See id.* Furthermore, appellants have failed to produce any evidence which points to the methods' lack of reliability. *See United States v. Quinn,* 18 F.3d 1461, 1465 (9th Cir.1994). While Tucker's testimony did not go into great detail, appellants neglected to take the opportunity to cross-examine Tucker about the "specifics of the process, the techniques he used, [or his] qualifications to give his findings." *Id.* Appellants also chose not to call their own expert chemist to cast Tucker's conclusions into doubt. *See id.* In light of appellants' failure to contest Tucker's assertions that the methods he used were scientifically valid, the district court did not abuse its discretion in admitting the testimony.

## IV. REQUIREMENT TO DESIGNATE A "MAIN" CROSS–EXAMINER

■■■■ Appellants argue that the district court violated their Sixth Amendment rights of cross-examination and to conflict-free representation. We review the trial court's decision to limit the scope of cross-examination for abuse of discretion. *United States v. Dudden,* 65 F.3d 1461, 1469 (9th Cir.1995). We review de novo whether the limitation on cross-examination violated a defendant's right of confrontation. *United States v. Marbella,* 73 F.3d 1508, 1513 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996). We also review de novo whether a defendant was denied the right to conflict-free representation. *Garcia v. Bunnell,* 33 F.3d 1193, 1195 (9th Cir.1994).

■■■ At the beginning of the trial, the judge informed the parties that she wanted to avoid having all three defense attorneys conducting the same cross-examination for each witness. Accordingly, she asked defense counsel to designate one attorney to conduct the "main" cross-examination into basic issues, but explained that all the attorneys also would have the opportunity to cross-examine as to issues affecting their individual clients.

"A restriction imposed on cross-examination 'does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant.'" *United States v. Marbella,* 73 F.3d at 1513 (quoting *United States v. Shabani,* 48 F.3d 401, 403 (9th Cir.1995)). Here, the trial court merely attempted to avoid repetitive cross-examination on basic matters. The court expressly allowed all defense attorneys to cross-examine as to issues particular to their own clients. In practice, appellants fail to show how the trial court's requirement limited any relevant testimony or caused them prejudice. As the government observes, the record suggests that, in any event, the court's order was not strictly enforced during trial. Defense counsel, in fact, often covered the same ground numerous times.

Appellants also claim that the trial court's order somehow converted the "main" cross-

examiner into the attorney for all defendants for purposes of that cross-examination. The trial court's order, made in an attempt to present the case to the jury in a more streamlined and coordinated way, cannot be construed to have converted each "main" cross-examiner into all the defendants' joint representative. All the defendants continued to be represented by their own attorneys, and all the attorneys had the opportunity to cross-examine government witnesses as to issues particular to their clients. Appellants' right to conflict-free representation was not impaired by the trial court's order.

## CONCLUSION

For the reasons set forth above, Cruz's conviction for attempted possession is affirmed, while his convictions for conspiracy and for possession are reversed, and his case is remanded for resentencing. Mesa's conviction is affirmed.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

HALL, Circuit Judge, concurring in part and dissenting in part.

Joey Mesa, Jaime Tenorio, Peter Balajadia, and Robert Taitano conspired to distribute more than 200 grams of crystal methamphetamine. When Balajadia informed Mesa that he was unable to complete the delivery, Billy Cruz voluntarily agreed to participate in the drug conspiracy. Cruz flew from California to Honolulu, met Balajadia in his hotel room, and put on a pair of underwear with a pouch sewn into it that he believed contained methamphetamine worth up to $169,000. Had the authorities not intervened, Cruz would have flown to Guam and delivered the drugs. Under Supreme Court and Ninth Circuit precedent, Cruz should be held liable for all of his actions. Accordingly, I dissent from that portion of the majority opinion reversing Cruz's conspiracy conviction.

The inchoate offense of conspiracy centers upon the *agreement* to commit an unlawful

act, not the commission of the unlawful act itself. "The accomplishment of the conspiracy's goal is immaterial to the crime." *United States v. Rueter*, 536 F.2d 296, 298 (9th Cir. 1976). In *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court recognized two ends served by the law of conspiracy. First, the law of conspiracy protects society from the dangers of concerted criminal activity. 420 U.S. at 693, 95 S.Ct. at 1260. Second, "[t]he law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act ..., regardless of whether the crime agreed upon is actually committed." 420 U.S. at 694, 95 S.Ct. at 1268. This second end recognizes the criminal intent crystallized in a conspiratorial agreement as dangerous and punishable apart from whether the substantive offense ever is, or even can be, brought to fruition. *See also United States v. Roselli*, 432 F.2d 879, 892 n. 18 (9th Cir.1970) (" '[Conspiracy] is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices.' ") (quoting *United States v. Rabinowich*, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211 (1915)), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

Conspiracy is a continuing offense. While a conspirator can withdraw from an ongoing conspiracy, *see United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir.1992),[1] the withdrawal of one or more conspirators typically will not affect the culpability of the remaining conspirators. *See United States v. Taylor*, 802 F.2d 1108, 1117 (9th Cir.1986) (conspiracy to sell bank bonds continued even after two of the conspirators, unbeknownst to the remaining conspirators, had been arrested and a portion of the bonds seized), *cert.*

---

**1.** A conspirator can withdraw from a conspiracy in at least three ways: (1) by disavowing the unlawful goal of the conspiracy; (2) by affirmatively acting to defeat the purpose of the conspiracy; or (3) by taking "definite, decisive, and

positive" steps to disassociate himself from the conspiracy. *Lothian*, 976 F.2d at 1261; *see also United States v. Loya*, 807 F.2d 1483, 1493 (9th Cir.1987); *United States v. Smith*, 623 F.2d 627, 631 (9th Cir.1980).

*denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987). This is so even where the withdrawal results from the arrest of a conspirator of which the other conspirators are unaware, *see id.*, and even where achievement of the ends of the conspiracy is no longer objectively possible. *See United States v. Bosch*, 914 F.2d 1239, 1241 (9th Cir.1990) ("We have 'rejected the doctrine of legal impossibility as a defense to a charge of conspiracy.' ") (quoting *United States v. Everett*, 692 F.2d 596, 599 (9th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983)); *United States v. Brooklier*, 685 F.2d 1208, 1217 (9th Cir.1982) ("[F]actual impossibility is no defense to an inchoate offense.").

After Balajadia and Taitano had been arrested in connection with the conspiracy to transport drugs to Guam and the drugs had been seized, Mesa and Tenorio, unaware of the arrests and seizure, continued to act in furtherance of the conspiracy. Their criminal intent unabated, they contacted Cruz, who agreed to travel to Honolulu to pick up the drugs from Balajadia and complete their transport to Guam. Cruz's agreement to join in the plot to transport the drugs, standing alone, supports his culpability under 21 U.S.C. § 846. In *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), the Supreme Court held that the government need not prove an overt act in order to establish a violation of § 846. Instead, "the criminal agreement itself is the *actus reus.*" 513 U.S. at 16, 115 S.Ct. at 386. There can be little doubt that by not only agreeing to assist Mesa and Tenorio in transporting the drugs to Guam, but also traveling to Honolulu and attempting to carry out the transport, Cruz evinced the criminal intent necessary to hold him complicit in the conspiracy.[2]

Cruz's culpability is not inconsistent with *United States v. Castro*, 972 F.2d 1107 (9th Cir.1992), *cert. denied*, 507 U.S. 944, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993), in which we stated that a conspiracy "is presumed to continue until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy." *Id.* at 1112. Just as an individual conspirator's withdrawal from or disavowal of a conspiracy terminates only his participation in the conspiracy, so the efforts of a conspirator to defeat the object of the conspiracy severs only that particular conspirator from the conspiracy. *See, e.g., Lothian*, 976 F.2d at 1261 (listing "affirmative[ ] act[s] to defeat the purpose of the conspiracy" as one means of withdrawal); *United States v. Nicoll*, 664 F.2d 1308, 1315 n. 6 (5th Cir. Unit B Jan. 1982) ("To prove withdrawal, a conspirator must show he acted affirmatively to defeat or disavow the purpose of the conspiracy."), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982). Balajadia's agreement to cooperate with authorities did no more than sever his own participation in the conspiracy. We should not misconstrue *Castro* to allow remaining conspirators to avoid culpability for acts in furtherance of a conspiracy simply because one or more of their associates have withdrawn or taken steps to defeat the object of the conspiracy.[3]

The mere fact that Cruz could not actually achieve the conspiracy's primary objective, which had been thwarted by the government's seizure of the drugs, is irrelevant in light of conspiracy law's focus on the agreement itself, not accomplishment of the substantive offense, and of our rejection of the impossibility defense to a charge of conspiracy.

---

**2.** While it is true that Cruz had not been involved in the conspiracy from its start, " '[o]ne may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him.' " *United States v. Bibbero*, 749 F.2d 581, 588 (9th Cir. 1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985) (quoting *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969)).

The majority attempts to distinguish *Bibbero* on the ground that the defendant in that case understood the full scope of and actively participated in the conspiracy. Cruz understood the full scope of the conspiracy to transport drugs, agreed to participate in the conspiracy, and traveled to Honolulu to carry out the drug transport.

**3.** Of course, the arrest of *all* conspirators will both defeat the object of the conspiracy and terminate the conspiracy with regard to each conspirator. *See Castro*, 972 F.2d at 1112 (deeming a drug conspiracy an ongoing offense because "the object of the conspiracy was not defeated until the final seizure of cocaine and the arrest of the coconspirators.")

*United States v. Robertson*, 659 F.2d 652 (5th Cir. Unit A Oct.1981), is instructive. The court, even assuming that the primary objective of a conspiracy to distribute marijuana had been thwarted by the Border Patrol before the defendant joined in the conspiracy, nonetheless held that the defendant could be held complicit in the original conspiracy. *Id.* at 657 n. 2. "There is no indication defendant knew the object of the conspiracy had become impossible. Since a 'culpable conspiracy may exist even though, because of the misapprehension of the conspirators to certain facts, the substantive crime that is the object of the conspiracy may be impossible to commit,' any actions taken by a person to achieve the goals of a conspiracy believed to be still in existence would be participating in the conspiracy." *Id.* (citations omitted).[4]

Even if the thwarting of the principal objective of a conspiracy were an event of some significance to the remaining conspirators, we have held in other contexts that an entire conspiracy does not terminate so long as subsidiary objectives have yet to be achieved. In *United States v. Walker*, 653 F.2d 1343, 1350 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982),

for instance, the defendant was convicted of bid rigging a timber sale by the United States Forest Service. The court ruled that the conspiracy continued, and thus the statute of limitations did not begin to run, until the defendant had cut the timber, paid a noncompetitive price for it, sold it for an excess profit, and split the excess with his coconspirators. The statute of limitations had not expired because some payoffs of coconspirators took place within the five year limitations period. *Walker*, 653 F.2d at 1349–50.[5] The result has been the same in coconspirator statement cases where the primary objective of the conspiracy had been defeated, not accomplished, before the secondary objective of receiving payment was sought. *See United States v. Mason*, 658 F.2d 1263 (9th Cir.1981) (holding that conspiracy had not terminated after DEA agent and cooperating conspirator had taken delivery of cocaine from another conspirator but had not yet received payment).

In this case, the conspiracy involved the transportation of drugs to Guam in exchange for payment. While the main objective of transportation ended once the drugs were seized, the subsidiary objective of receiving

---

4. *See also United States v. Katz*, 601 F.2d 66, 68 (2d Cir.1979) ("Appellants seem to [argue] that after the coconspirator's arrest and relinquishment of possession of the bonds to government authorities the objective of the conspiracy could no longer be attained. But impossibility is not defense to a conspiracy charge, and so again the argument that the entire conspiracy terminated must fail.") (citation omitted).

The majority states that it was factually impossible for Cruz to have joined the conspiracy among Mesa, Tenorio, Balajadia, and Taitano after Balajadia and Taitano had been arrested. The majority instead contends that Cruz could only have become a member of a new conspiracy with Mesa and Tenorio. However, we have long recognized that changes in the membership or roles of coconspirators do not convert a single conspiracy into multiple conspiracies. *See United States v. Taren–Palma*, 997 F.2d 525, 530 (9th Cir.1993) ("A mere change in participants ... [is] insufficient to support a finding of multiple conspiracies."), *cert. denied*, 511 U.S. 1071, 114 S.Ct. 1648, 128 L.Ed.2d 368 (1994); *Marino v. United States*, 91 F.2d 691, 696 (9th Cir.1937) ("In the situation where a conspiracy has been formed, the joinder thereof by a new member does not create a new conspiracy.... Where, after formation of a conspiracy, one of the con-

spirators withdraws, such withdrawal neither creates a new conspiracy, nor changes the status of the remaining members."), *cert. denied*, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593 (1938).

Moreover, it is well established that conspirators who take steps to defeat the object of a conspiracy or otherwise withdraw from the conspiracy can escape liability only for the underlying substantive offense, if it is brought to fruition, and *not* for the conspiracy itself. *See Lothian*, 976 F.2d at 1262 ("[O]nce an overt act has taken place to accomplish the unlawful objective of the agreement, the crime of conspiracy is complete and the defendant is liable despite his later withdrawal."). Thus, because Cruz willingly participated in the unlawful agreement among Mesa, Tenorio, Balajadia, and Taitano with the intent of advancing the object of that agreement, it is quite logical for all five to be charged as part of the same conspiracy to distribute methamphetamine.

5. Other circuits have agreed that the limitations period does not commence until the conspirators have received the anticipated economic benefits of their crime. *United States v. Girard*, 744 F.2d 1170, 1172–73 (5th Cir.1984); *United States v. Helmich*, 704 F.2d 547, 549 (11th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 353, 78 L.Ed.2d 317 (1983); *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982).

payment in exchange for the transportation continued when Cruz agreed to take Balajadia's place and deliver the drugs to Guam. In other words, the broad objective was to receive ill-gotten gains from transporting methamphetamine, and the conspiracy continued as Cruz attempted to earn his fee for transporting the drugs.

Cruz's agreement to transport the drugs represents exactly the sort of deliberate plot to subvert the law that the criminalization of conspiracy is intended to prevent. The fact that he could not carry out his role in the conspiracy because the drugs had been seized should not mitigate the illegality of his agreement. The possibility that a person in Balajadia's position can ensnare an unlimited number of acquaintances into the conspiracy web after he has agreed to cooperate with authorities is mitigated by the defense of entrapment, which the majority agrees should be rejected in this case. We should not subvert our drug laws and the law of conspiracy to protect those unfortunate enough to join a conspiracy after it has been penetrated by law enforcement.

I therefore would hold that any rational jury could have found beyond a reasonable doubt that the conspiracy continued beyond the time Cruz became involved.[6] I would affirm the district court.[7]

---

6. Such a ruling would require the court to consider the merits of Cruz's contention that the trial court abused its discretion when it limited the scope of his closing argument. The court's ruling simply prevented Cruz from making an erroneous legal argument: that the conspiracy had ended simply because several coconspirators had been arrested at the airport. Thus, remand would not be necessary.

7. I agree with the majority that the possession conviction must be reversed. However, remanding for resentencing is unnecessary. Nothing in the record suggests that Cruz's conviction for possession enhanced his sentences for conspiracy or attempt. *See United States v. Baker,* 10 F.3d 1374, 1421 (9th Cir.1993), *cert. denied,* 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).