**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

C. MARVIN WILBUR, AKA Marvin
Wilbur, Sr.,
            *Defendant-Appellant.*

No. 10-30185

D.C. No.
2:09-cr-00191-
MJP-1

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JOAN C. WILBUR,
            *Defendant-Appellant.*

No. 10-30186

D.C. No.
2:09-cr-00191-
MJP-2

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

APRIL M. WILBUR,
            *Defendant-Appellant.*

No. 10-30187

D.C. No.
2:09-cr-00191-
MJP-3

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

BRENDA R. WILBUR,
            *Defendant-Appellant.*

No. 10-30188

D.C. No.
2:09-cr-00191-
MJP-4

OPINION

3711

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
June 8, 2011—Seattle, Washington

Filed April 6, 2012

Before: Stephen Reinhardt, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by Judge Rawlinson

## COUNSEL

James E. Lobsenz, CARNEY BADLEY SPELLMAN, P.S., Seattle, Washington, for the appellants.

Helen J. Brunner, Richard Edward Cohen, Mary K. Dimke, J. Tate London, OFFICE OF THE UNITED STATES ATTORNEY, Seattle, Washington, for the appellee.

## OPINION

W. FLETCHER, Circuit Judge:

Marvin, Joan, April, and Brenda Wilbur (collectively "Defendants" or "the Wilburs") were indicted for an eight-year conspiracy to violate the Contraband Cigarette Trafficking Act ("CCTA") by trafficking in "contraband cigarettes." They were also indicted for several substantive counts of violating the CCTA and several counts of money laundering based on transfers of their earnings from the allegedly contraband cigarettes. Contraband cigarettes, as defined in relevant part by the CCTA, are cigarettes "which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found." 18 U.S.C. § 2341.

The Wilburs moved to dismiss the indictment. They argued that the state of Washington retroceded its cigarette taxation to the Swinomish Tribe during the period of a cigarette tax contract it entered into with the Swinomish Tribe. They argued that the only cigarette taxes applicable to their activities were thus tribal taxes, not the "State or local cigarette

taxes" referred to in the CCTA. The Wilburs also argued that their indictment was based on ambiguous tax laws and therefore violated due process, and that their right to trade in untaxed cigarettes is guaranteed by the Treaty at Point Elliott. The district court denied the motion to dismiss the indictment. The Wilburs then pled guilty to the eight-year conspiracy to violate the CCTA, conditioned on their right to appeal the district court's denial of their motion to dismiss.

For the reasons that follow, we agree with the Wilburs that during the period from 2003 to 2005, when they were licensed to sell tobacco by the Swinomish Tribe, there were no "applicable State or local cigarette taxes" under the CCTA. We also agree with the Wilburs that the five-year statute of limitations for CCTA violations bars any charges based on activity from 1999 to 2003. We conclude, however, that after their tribal tobacco license expired in 2005, the Wilburs' activities ceased to be covered by the Swinomish cigarette tax contract ("CTC"), and that the state's retrocession therefore ceased to apply. The unstamped cigarettes the Wilburs transported and sold during this period were thus "contraband" under the CCTA. We reject the Wilburs' due process and treaty arguments.

We affirm in part, reverse in part, and remand for resentencing consistent with this opinion.

## I.  Background

The CCTA makes it unlawful to knowingly "ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342(a). The CCTA defines contraband cigarettes as:

> a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local gov-

ernment requires a stamp, impression, or other indi-
cation to be placed on packages or other containers
of cigarettes to evidence payment of cigarette taxes,
and which are in the possession of any person . . . .

18 U.S.C. § 2341(2). Thus, "[a] violation of the state cigarette
tax law is a predicate to a CCTA violation." *United States v.
Gord*, 77 F.3d 1192, 1193 (9th Cir. 1996).

The Washington cigarette tax laws at issue in this case are
complicated, especially as they apply to Indian tribes. We first
provide an overview of the relevant Washington cigarette tax
scheme. We then describe the specific facts and procedural
history of this case.

### A.  Washington Cigarette Tax Scheme

Washington imposes a sales tax, a use tax, and a separate
cigarette tax on cigarettes. Rev. Code of Wash. ("RCW")
§§ 82.08.020 (retail sales tax), 82.12.020 (use tax),
82.24.020(1) (cigarette tax). To enforce its cigarette tax,
Washington requires that cigarette packages bear a stamp
demonstrating compliance with Washington law. According
to RCW § 82.24.030(1):

> The stamps must be affixed on the smallest container
> or package that will be handled, sold, used, con-
> sumed, or distributed, to permit the department to
> readily ascertain by inspection, whether or not such
> tax has been paid or whether an exemption from the
> tax applies.

*See also* Wash. Admin. Code ("WAC") § 458-20-
186(201)(a). The stamps must either represent that the tax has
been paid or indicate that the cigarettes are exempt from the
tax.[1] RCW § 82.24.030(2). Cigarette wholesalers are responsi-

---

[1]As we discuss below, cigarettes are exempt from tax if they are sold
by a tribal retailer to a member of the same tribe.

ble for affixing stamps. *Id.* Wholesalers must be licensed by the state. *Id.* § 82.24.040(1). Various rules govern wholesalers' obligations concerning when and how to affix the stamps. *See id.* § 82.24.040.

Cigarette retailers are generally prohibited from possessing unstamped cigarettes within the state of Washington. *Id.* § 82.24.050(1). Retailers must obtain cigarettes from licensed wholesalers. *Id.* § 82.24.050(2). Unauthorized receipt, shipment, and sale of unstamped cigarettes by non-wholesalers is a crime under Washington law. *Id.* § 82.24.110.

In general, only licensed wholesalers can transport unstamped cigarettes within the state. WAC § 458-20-186(401). Licensed wholesalers can transport unstamped cigarettes only in their own vehicles, unless they give prior notice to the liquor control board. *Id.* Anyone other than a licensed wholesaler who intends to transport unstamped cigarettes in the state must first give notice to the liquor control board. RCW § 82.24.250(1); WAC § 458-20-186(402). Anyone other than a licensed wholesaler transporting unstamped cigarettes must be transporting them to a licensed wholesaler or to a person or organization that has given notice to the liquor control board of their intended possession of unstamped cigarettes. RCW § 82.24.250(2)-(3), (7).

There has been a long-standing dispute about the state's power to tax cigarette sales by tribal retailers on Indian reservations to non-Indians. In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 159-60 (1980), the Supreme Court held that the state could impose a cigarette tax on cigarette sales by Indian retailers on reservations to non-Indians. The Court reasoned that the incidence of a tax on sales to non-Indians falls on the non-Indian customer, not on the Indian retailer. It held that the state can impose the "minimal burden[ ]" on the Indian retailer of only selling stamped cigarettes to non-Indians. *Id.* at 159.

As the Court recognized in *Colville*, one of the underlying issues in the cigarette taxing dispute between the state and the tribes is the ability of the tribes to impose their own cigarette tax. *Id.* at 154-55. The tribes had argued that if the state could enforce its cigarette tax, the tribes would be forced to drop their own tax or else their tribal retailers would be forced to sell at higher prices than off-reservation sellers. The state argued that because the tribal taxes were often significantly lower than the state taxes, what the tribes really wanted was to allow tribal retailers to undercut off-reservation retailers. This would seriously undermine the state's cigarette tax regime because non-Indian cigarette purchasers could travel to the reservations in order to avoid the state tax. *Id.*

After *Colville*, in an attempt to resolve this underlying issue, Washington passed legislation authorizing the Governor to enter into cigarette tax contracts ("CTC") with various tribes. RCW §§ 43.06.450, 43.06.460. A CTC is typically an agreement by the state to retrocede its cigarette taxes to the tribe for transactions covered by a CTC in exchange for the tribe's agreement to impose a cigarette tax equal to the state's and to use the proceeds to fund essential tribal government services. This case concerns the state's tax retrocession under the CTC it signed with the Swinomish Tribe.

The CTC legislation provides that "[a]ll cigarette tax contracts shall meet the requirements for cigarette tax contracts under this section." *Id.* § 43.06.455(1). The tax contracts "shall be in regard to retail sales in which Indian retailers make delivery and physical transfer of possession of the cigarettes . . . within Indian country." *Id.* § 43.06.455(2). For this and all other statutory provisions, there are three definitions of "Indian retailer." These are:

> (i)   a retailer wholly owned and operated by an Indian tribe,
>
> (ii)  a business wholly owned and operated by a tribal member and licensed by the tribe, or

> (iii)   a business owned and operated by the Indian person or persons in whose name the land is held in trust[.]

*Id.* § 43.06.455(14)(b).

The legislation describes conditions a tribe must accept to enter into a CTC. The CTC "shall provide that the tribal cigarette tax rate be one hundred percent of the state cigarette and state and local sales and use taxes." *Id.* § 43.06.460. The Governor is authorized to allow a three-year phase-in period during which the tribal tax rate can be eighty percent of the state tax rate. *Id.* The contract "shall provide" that retailers cannot sell cigarettes to people under eighteen years old. *Id.* § 43.06.455(2). The contract "shall provide that all cigarettes possessed or sold by a retailer shall bear a cigarette stamp." *Id.* § 43.06.455(4). These stamps can be tribal stamps, but the tribes must establish procedures to ensure that the stamps represent tax-paid or tax-exempt status. *Id.* The contract "shall provide" that Indian retailers can purchase cigarettes only from licensed Washington wholesalers, tribal manufacturers, or out-of-state wholesalers or manufacturers who have agreed to comply with the terms of the CTC. *Id.* § 43.06.455(5). Finally, "[t]ax revenue retained by a tribe must be used for essential government services." *Id.* § 43.06.455(8).

**[1]** The legislation also establishes the extent of the state's retrocession during the life of a CTC. The tribal cigarette tax "shall" be "in lieu of all state cigarette taxes and state and local sales and use taxes on sales of cigarettes in Indian country by Indian retailers." *Id.* § 43.06.455(3). The retail sales tax "does not apply to sales of cigarettes by an Indian retailer during the effective period of a cigarette tax contract." *Id.* § 82.08.0316. Similarly the use tax "shall not apply in respect to the use of cigarettes sold by an Indian retailer during the effective period of a cigarette tax contract." *Id.* § 82.12.0316. Finally, the separate cigarette taxes "do not apply to the sale, use, consumption, handling, possession, or distribution of cig-

arettes by an Indian retailer during the effective period of a cigarette tax contract."[2] *Id.* § 82.24.295. The same three definitions of "Indian retailer" described above apply to these sections. RCW § 43.06.455(14)(b).

On October 3, 2003, Washington and the Swinomish Tribe (the "Tribe") entered into a CTC pursuant to RCW §§ 43.06.455 and 43.06.460 (the "Swinomish CTC" or the "Contract"). The Swinomish CTC applies "to the retail sale of cigarettes by Tribal retailers." A Tribal retailer is defined in the Contract as "a cigarette retailer wholly owned by the Swinomish Tribe and located in Indian country or a member-owned smokeshop located in Indian country and licensed by the Tribe." Thus, in defining "Tribal retailer" the Contract adopted the first two definitions of "Indian retailer" from RCW § 43.06.455(14)(b), but not the third.

The Tribe agreed to impose cigarette taxes "on all sales by Tribal retailers" equal in amount to the state taxes. The Tribe also agreed that all cigarettes sold by Tribal retailers "shall bear a Tribal tax stamp," and agreed on various procedures concerning the stamps. Finally, the Tribe agreed that it, as well as all member Tribal retailers, will purchase cigarettes for resale only from wholesalers licensed by the state of Washington.[3]

The state in turn agreed to "retrocede[ ] from its tax during the time this Contract is in effect." It also agreed in the CTC:

---

[2]The Washington Administrative Code similarly provides that non-Indian purchasers can purchase cigarettes "without incurring liability for state cigarette tax [under RCW Chapter 82.24]" from "one who is subject to the terms of a valid cigarette tax contract with the state." WAC § 458-20-186(102)(c)(i). It also provides that the cigarette tax "does not apply to cigarettes taxed by an Indian tribe in accordance with a [CTC]." WAC § 458-20-186(303)(b).

[3]The Contract also contains provisions, not at issue in this case, that allow for the Tribe to enter into a later memorandum of agreement with the state allowing the tribe to purchase from out-of-state or self-certified tribal wholesalers.

As to all transactions that conform with the require-ments of this Contract, such transactions do not vio-late state law, and the State agrees that it will not assert that any such transactions violate state law for the purpose of 18 U.S.C. § 2342 [the CCTA] or other federal law specifically based on violation of state cigarette laws.

After the Contract went into effect, the Swinomish Tribe amended its tobacco tax and regulations of tobacco retailers to comply with its obligations under the Contract. *See* Swi-nomish Tribal Code §§ 15-03.010 *et seq.*, 17-04.010 *et seq.* (2003).

### B.    Factual Background and Procedural History

Defendants Marvin Wilbur and Joan Wilbur are husband and wife and are enrolled members of the Swinomish Tribe. Defendants April and Brenda Wilbur are Marvin and Joan's daughters-in-law. Marvin Wilbur is the owner of the Trading Post, a store on the Swinomish reservation that specializes in selling various tobacco products, including cigarettes. The rest of the Wilburs have helped operate the Trading Post. In operating the Trading Post, the Wilburs used three different trusts: the Salish Trust, Skagit Trust, and Skagit Cigarette Sales Trust. Neither the Trading Post, nor any of the trusts, nor anyone associated with the Trading Post, was a licensed Washington cigarette wholesaler.

Starting in approximately July 1999, Defendants began pur-chasing and selling to the general public untaxed and unstam-ped cigarettes. They continued doing so for the next eight years. Throughout the course of their sale of unstamped ciga-rettes, the Wilburs never pre-notified the Washington liquor control board of the shipment of unstamped cigarettes, as required by Washington law. On only one occasion did the company shipping the cigarettes to the Wilburs pre-notify the liquor control board.

After the state and the Tribe signed the Swinomish CTC on October 3, 2003, Marvin and Joan Wilbur brought a suit attempting to block the state and the Tribe from entering into the Swinomish CTC, but the suit failed, *see Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005), *abrogated in part on other grounds by Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 (2010). According to a declaration from Allan Olson, the general manager of the Swinomish Indian Tribal Community, the Tribe knew of Defendants' sale of untaxed cigarettes at that time.

At the time the Swinomish CTC went into effect, the Trading Post was licensed by the Tribe as a tobacco retailer. On June 1, 2004, the Tribe wrote the Wilburs a letter, informing them that a "recent visit to your store has indicated that you are still selling un-stamped cigarettes contrary to" tribal law. The letter ordered the Wilburs to "immediately cease all sales of cigarettes not bearing a Swinomish Tribal Tax Stamp." The letter informed the Wilburs, "If you fail to come into compliance with the requirements of the law by close of business on June 8, 2004, your license to sell tobacco on the Swinomish Reservation will be revoked and the Tribe will pursue both criminal and civil penalties." Defendants did not cease sales of unstamped cigarettes, but there is no evidence in the record that the Tribe took any action to revoke the license on June 8, 2004.

Early in 2005, the Wilburs attempted to renew the Trading Post's tribal tobacco license, which was due to expire on March 31, 2005. On March 28, 2005, the Tribe wrote to the Wilburs and informed them that they had not satisfied certain requirements for obtaining a tobacco license, including various audits and records of tax payments. The letter informed the Wilburs that until they completed these requirements, "you are not allowed to sell any tobacco products from the Trading Post or any other location on the Reservation. Violation of this prohibition could result in civil penalties including fines and could possibly prohibit you from obtaining a license

for future sales." In response, the Wilburs' attorney wrote to the Tribe arguing that the "license requirement is preempted by the State of Washington Compact and statutes implementing the compact." We have not been made aware of the "Compact" to which the Wilburs' attorney referred. The Wilburs continued to sell unstamped cigarettes from the Trading Post. According to various members of the Tribe administration, the Trading Post never possessed a tribal license to sell cigarettes after April 1, 2005.

Believing it did not have the resources to take action against the Trading Post and the Wilburs, the Tribe contacted the U.S. Attorney's Office, which began an investigation. After conducting several under-cover buys of unstamped cigarettes, federal agents executed a search warrant for the Trading Post on May 15, 2007. They were assisted by Tribal law enforcement officers. J. Mark Keller, a Lieutenant with the Washington State Liquor Control Board who was deputized as a Special Deputy U.S. Marshall, led the search. The agents confiscated approximately 3.6 million cigarettes in packaging that did not bear evidence of state or tribal taxes. The agents also seized over $100,000 in cash and bank accounts. *See United States v. Approximately 3,609,820 Cigarettes of Assorted Brands, More or Less*, No. C07-16032, 2009 WL 773868, at *1 (W.D. Wash., March 20, 2009) [hereinafter *Cigarettes*].

On May 13, 2008, the Swinomish Tribe filed a civil forfeiture action in Swinomish Tribal Court seeking forfeiture of the seized cigarettes in the event the United States released the cigarettes from federal custody and control. The Tribe also sought over $365,000 in unpaid tribal cigarette taxes on the seized cigarettes.

On June 10, 2009, the United States filed an indictment against the Wilburs. The United States filed a Second Superseding Indictment ("SSI") on October 29, 2009. Count 1 of

the SSI charged Defendants with a conspiracy to traffic in contraband cigarettes. Specifically, Count 1 charged:

> Beginning on an exact date unknown, but at least from in or about July 1999, and continuing through on or about May 15, 2007, in Skagit County, within the Western District of Washington, and elsewhere, the Defendants . . . did willfully and knowingly conspire, combine, confederate and agree with each other . . . to purchase, ship, transport, receive, possess, sell, and distribute contraband cigarettes, as that term is defined in Title 18, United States Code, Section 2341, in violation of Title 18, United States Code, Section 2342(a).

The SSI also charged Defendants with six counts of trafficking in contraband cigarettes in violation of the CCTA on various dates during the alleged eight-year conspiracy. Finally, the SSI charged Defendants with one count of conspiracy to launder money and thirteen counts of money laundering based on Defendants' transfer of the money obtained through the sale of the allegedly contraband cigarettes.

Defendants moved to dismiss the indictment. They argued that the cigarettes were not "contraband" under the CCTA because, at least during the time the Swinomish CTC was in effect, there were no "applicable State or local taxes." 18 U.S.C. § 2341(2). Specifically, they argued that during the time the Swinomish CTC was in effect, the state retroceded its taxation of cigarettes by "Indian retailers," and that the Trading Post was an Indian retailer under both RCW § 43.06.455(14)(b)(ii) during the time it had a tobacco license from the Tribe, and RCW § 43.06.455(14)(b)(iii) during the entire period covered by the indictment. Defendants also argued that the indictment was based on ambiguous tax statutes and so violated due process, and that Washington was barred from taxing Defendants' cigarette sales by the Treaty at Point Elliott.

The district court concluded that the Swinomish CTC provides only a "limited exception to the state's cigarette taxation rules" for "sales that conform to its requirements." The Court relied primarily on the Contract's provision that "all transactions that conform with the requirements of this Contract . . . do not violate state law, and the State agrees that it will not assert that any such transactions violate state law for the purpose of [the CCTA]." It concluded that "[i]mplicit in this statement is that the tax retrocession applies only to sales that conform to the Contract." Because the cigarettes in this case were unstamped and thus did not conform to the Contract, the district court held that the state had not retroceded its taxation, and thus that the cigarettes were contraband under the CCTA. The district court had no need to address points in time at which the Trading Post might have qualified as an "Indian retailer" under Washington statute or a "Tribal retailer" under the Swinomish CTC.

The district court also rejected Defendants' other arguments. It concluded that under our decision in *United States v. Baker*, 63 F.3d 1478 (9th Cir. 1995), the indictment did not violate due process because the Wilburs can be presumed to have knowledge of cigarette taxing requirements, and the due process cases on which the Wilburs relied required knowledge of the criminal violation whereas the CCTA does not. The district court also rejected Defendants' treaty argument, concluding that although the members of the Swinomish Tribe who signed the Treaty at Point Elliott "would not have intended to submit to be restricted in their trade in tobacco," our holding in *Baker* foreclosed any argument that the state cigarette taxes at issue constituted such a restriction. The district court therefore denied the motion to dismiss the indictment.

After the denial of their motion to dismiss the indictment, Defendants conditionally pled guilty to Count 1 of the indictment (the conspiracy count). The other counts were dismissed. The district court sentenced Marvin Wilbur to twelve

months and one day of incarceration. It sentenced Joan Wilbur to five months of incarceration, followed by five months of electronic home monitoring. It sentenced April and Brenda Wilbur to ninety days of electronic home confinement. It also ordered restitution in the amount of $10.9 million, the calculated amount of tax loss for the entire eight-year conspiracy, to be paid to the state of Washington.

Defendants timely appealed.

## II.   Standard of Review

We review de novo the district court's decision not to dismiss an indictment based on its interpretation of a federal statute. *United States v. Gomez-Rodriguez*, 96 F.3d 1262, 1264 (9th Cir. 1996) (en banc). We review the district court's findings of fact with regard to a motion to dismiss an indictment for clear error. *See United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998). We "presume the allegations of an indictment to be true for purposes of reviewing a district court's ruling on a motion to dismiss." *United States v. Smiskin*, 487 F.3d 1260, 1263 n.5 (9th Cir. 2007).

## III.   Discussion

On appeal, Defendants raise the same CCTA, due process, and treaty arguments they raised before the district court. Defendants also argue that the state did not have the power to tax Defendants under Washington law. We address these arguments in turn.

## A.   Conspiracy to Violate the CCTA

Defendants argue that because there were no state or local taxes applicable to the cigarettes they were selling, they could not have conspired to violate the CCTA. To analyze this claim, we divide the eight years during which the Wilburs sold unstamped cigarettes into three periods. During the first

period, from July 1999 to October 2003, Washington had not entered into a CTC with the Swinomish Tribe. During the second period, from October 2003 to March 2005, the Swinomish CTC was in effect, and the Trading Post was licensed to sell tobacco by the Tribe. During the final period, from April 2005 to the time of the raid in May 2007, the Swinomish CTC was in effect, and the Trading Post was not licensed to sell tobacco by the Tribe. For the reasons that follow, we conclude that Defendants' actions violated the CCTA during the first and third period, but not the second. We then discuss the implications of our conclusion for the indictment and guilty plea.

### 1.   Before the Swinomish CTC

**[2]** The first period extends from 1999, the beginning of the alleged conspiracy, to 2003, when the Swinomish CTC was signed. During this period, none of Washington's retrocession provisions applied. During this period there clearly was an "applicable State . . . cigarette tax[ ]," 18 U.S.C. § 2341(2), and the unstamped cigarettes received, possessed, and sold by the Wilburs were therefore "contraband" under the CCTA.

There is a five-year statute of limitations on CCTA prosecutions. 18 U.S.C. § 3282(a). The United States did not file the indictment against Defendants until June 10, 2009, more than five years after the Swinomish CTC went into effect. Criminal prosecution for any substantive violations of the CCTA that took place during the period before the Swinomish CTC fall outside the statute of limitations. The government, however, has alleged a continuing eight-year conspiracy beginning in 1999 and extending through 2007. In order for the conspiracy to have occurred during the statute of limitations period, only one overt act in furtherance of the conspiracy must have occurred during that period. *See United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000). We discuss

below the implications of the statute of limitations for Defendants' indictment for activity during this period.

## 2. After the Swinomish CTC When the Trading Post Was Licensed

**[3]** The second period extends from the signing of the Swinomish CTC in 2003 to the revocation of the Trading Post's tribal tobacco license in 2005. During this period the Swinomish CTC was in effect, and the Trading Post was licensed by the Tribe to sell tobacco. During this period the Trading Post qualified both as an "Indian retailer" under RCW § 43.06.455(14)(b)(ii) and as a "Tribal retailer" under the Swinomish CTC.

**[4]** The unambiguous language of both the applicable Washington statutes and the Swinomish CTC compels the conclusion that there were no state cigarette taxes applicable to the Wilburs during this period. First, Washington's cigarette tax statutes provide for retrocession on all transactions covered by the Swinomish CTC while the Trading Post was licensed by the Tribe. Under Washington law, the retail sales tax on cigarettes "does not apply to sales of cigarettes by an Indian retailer during the effective period of a cigarette tax contract." *Id.* § 82.08.0316. The use tax on cigarettes "shall not apply in respect to the use of cigarettes sold by an Indian retailer during the effective period of a cigarette tax contract." *Id.* § 82.12.0316. Finally, the state's cigarette taxes "do not apply to the sale, use, consumption, handling, possession, or distribution of cigarettes by an Indian retailer during the effective period of a cigarette tax contract." *Id.* § 82.24.295. These statutes unambiguously provide that so long as the Swinomish CTC was in effect, the Trading Post was covered by the Swinomish CTC, and the Trading Post was an "Indian retailer," the state taxes on cigarettes did not apply to the Trading Post's transactions.

There is no dispute that, starting in October 2003, the Swinomish CTC was in effect. Further, at least while licensed by

the Tribe, the Trading Post was an "Indian retailer." For purposes of the relevant Washington statutes, an "Indian retailer" is defined under state law as:

> (i)  a retailer wholly owned and operated by an Indian tribe,
>
> (ii)  a business wholly owned and operated by a tribal member and licensed by the tribe, or
>
> (iii)  a business owned and operated by the Indian person or persons in whose name the land is held in trust[.]

*Id.* § 43.06.455(14)(b). The Trading Post qualified as an Indian retailer under (ii) because it was owned and operated by Marvin Wilbur, a member of the Swinomish Tribe, and because it was licensed by the Tribe.

Second, the Swinomish CTC supports the conclusion that the state retroceded from its cigarette taxes for the Trading Post's transactions while the Swinomish CTC was in effect, and while the Trading Post possessed a tribal tobacco license. The Swinomish CTC applies "to the retail sale of cigarettes by Tribal retailers." Like "Indian retailers" under the Washington statutes, "Tribal retailers" is defined in the Swinomish CTC to include "a member-owned smokeshop located in Indian country and licensed by the Tribe." The Swinomish CTC further provides that "the State retrocedes from its tax during the time this Contract is in effect." The Swinomish CTC thus provides that the state retroceded from its cigarette taxes, at least so long as the Trading Post qualified as a "Tribal retailer" under the CTC.

**[5]** Because the state retroceded its taxes, there were no "applicable State or local cigarette taxes" that the Wilburs failed to pay, and the cigarettes they sold during this period were not contraband under the CCTA. Because the cigarettes

were not contraband under the CCTA, the Wilburs could not have conspired to violate the CCTA during this period.

The government makes two arguments why, despite the seemingly unambiguous language quoted above, the cigarettes the Wilburs sold during this period were contraband under the CCTA. We find neither argument convincing.

First, the government argues that, as the district court concluded below, "the State's retrocession under the Tax Contract applies only to sales that conform to its core requirements." In other words, the government argues that if a tribal cigarette retailer sells cigarettes without a tribal stamp, the state's cigarette tax retrocession does not apply. The government and the district court rely almost entirely on the Swinomish CTC's provision that, "[a]s to all transactions that conform with the requirements of this Contract, such transactions do not violate state law, and the State agrees that it will not assert that any such transactions violate state law for the purpose of [the CCTA]." The district court concluded, and the government argues to us, that "[i]mplicit in this statement is that the tax retrocession applies only to sales that conform to the Contract. It also implies that sales which do not conform to the Tax Contract are subject to state law and the CCTA."

**[6]** This argument ignores the clear retrocession language in the statute. Even had the governor wanted to agree to make Washington's tax retrocession for the Swinomish Tribe conditional on the actions of individual cigarette retailers, the governor cannot by contract repeal statutes that explicitly make the state's cigarette taxes inapplicable to "Indian retailers" "during the effective period of a cigarette tax contract." RCW §§ 82.08.0316, 82.12.0316, 82.24.295. Regardless of the Wilburs' failure to collect the tribal tax from their customers, Washington law is clear in stating that the state's cigarette taxes do not apply to the Trading Post during the time the Swinomish CTC was in effect and the Trading Post had a tribal tobacco license.

The argument also misunderstands the nature of CTCs. CTCs are agreements between the state of Washington and the Indian tribes. In a CTC, each government agrees to make certain changes to its laws in exchange for the other government's agreement to make changes to its laws. In the Swinomish CTC, Washington agreed to retrocede its cigarette taxes during the time the Swinomish CTC was in effect. In return, the Swinomish Tribe agreed to impose cigarette taxes equal in amount to the state cigarette taxes. The Swinomish Tribe further agreed to require that all cigarettes sold by Tribal retailers bear a tribal tax stamp.

The Contract places no obligations on anyone other than the state of Washington and the Tribe. It provides that "[n]o third party shall have any rights or obligations under this Contract." Any obligation on individual retailers comes not from the Contract, but from the tribal laws enacted pursuant to the Contract. The state's contractual retrocession is not conditional on the actions of non-parties. To the extent the Contract's provision that "transactions that conform with the requirements of this Contract . . . do not violate state law" implies that the tax retrocession is conditional, it is conditional on the Tribe passing the laws required by the Contract.

Second, the government argues that even if the cigarettes sold by the Trading Post during this period were not contraband based on their lack of a tribal stamp, they were contraband because neither Defendants, nor anyone else, provided pre-notification of their transport to the liquor control board. Washington law regulates the transportation of unstamped cigarettes. For example, it provides:

> No person other than: (a) A licensed wholesaler in the wholesaler's own vehicle; or (b) a person who has given notice to the [liquor control] board in advance of the commencement of transportation shall transport or cause to be transported in this state

> cigarettes not having the stamps affixed to the packages or containers.

RCW § 82.24.250(1). Washington law also regulates the possession of unstamped cigarettes in the state. *Id.* § 82.24.250(3), (7). Other than licensed wholesalers and the United States government, organizations must give notice to the Washington liquor control board before receiving unstamped cigarettes in the state. *Id.* § 82.24.250(7). Cigarettes possessed or transported by a non-wholesaler without prenotification are "contraband" under Washington law. *Id.* § 82.24.250(4). The government argues that because Washington never waived these pre-notification provisions, and because the cigarettes sold and possessed by the Trading Post were transported and possessed without following these prenotification provisions, the cigarettes were "contraband" under the CCTA.

**[7]** It is clear that the Wilburs violated these prenotification requirements, that the state never waived these pre-notification requirements, and that the cigarettes were therefore "contraband" under Washington law. *See id.* § 82.24.250(4). The CCTA, however, does not make cigarettes "contraband" under federal law simply because they are contraband under state law. Cigarettes are only contraband under the CCTA if they "bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found." 18 U.S.C. § 2341(2). If there are no "applicable State or local cigarette taxes," cigarettes are not contraband, regardless of whether they were transported in violation of state law.

The government correctly notes that we have held in cases not involving CTCs that a violation of Washington's prenotification requirement is sufficient to make cigarettes contraband. *See, e.g.*, *United States v. Fiander*, 547 F.3d 1036, 1039 (9th Cir. 2008); *United States v. Gord*, 77 F.3d 1192, 1194 (9th Cir. 1996). In *Gord*, we held that even if no state

taxes were due on certain unstamped cigarettes because they were intended for sale only to tribal members, the cigarettes were still "contraband" under the CCTA if the cigarettes were possessed or transported without state pre-approval. The government notes that in *Gord*, because the cigarettes were tax-exempt, there were technically no "applicable State or local cigarette taxes" and yet we still found the cigarettes "contraband."

**[8]** Our holding in *Gord* does not support the government's argument. There was no CTC involved in that case. Because there was no CTC, the defendants were required to affix a Washington state tax stamp, even if that tax stamp simply represented that the cigarettes were tax-exempt. Further, and more important, state cigarette taxes were applicable in *Gord*. Under the part of the Washington Administrative Code that governs the tax-exempt sale of cigarettes to tribal members absent a CTC, if Washington's pre-notification provisions are not followed for cigarettes intended for sale to tribal members, then "the person making or attempting . . . delivery will be held liable for payment of the cigarette tax and penalties." WAC § 458-20-192(9)(a)(iii). The applicability of the state cigarette tax was the basis for our decision in *Gord*. *Gord*, 77 F.3d at 1194. Unlike in *Gord*, in this case there was a CTC in effect, the stamps at issue were tribal rather than state stamps, and there were no state taxes owed. We conclude that in this case, unlike in *Gord*, Defendants' violation of Washington's pre-notification requirement did not make the cigarettes "contraband" under the CCTA.

**[9]** We therefore hold that during the period in which the Swinomish CTC was in effect, and the Trading Post was licensed to sell tobacco by the Tribe, Defendants' actions did not violate the CCTA.

### 3.   After the Trading Post's Swinomish Tobacco License Expired

**[10]** The third and final period extends from April 2005, when the Trading Post's tribal license to sell tobacco expired,

to the end of the alleged conspiracy in 2007. During this period, the Swinomish CTC no longer applied to the Wilburs' transactions. The Swinomish CTC states: "[T]his Contract shall apply to the retail sale of cigarettes by Tribal retailers." As we discussed above, a "Tribal retailer" is defined in the CTC as "a cigarette retailer wholly owned by the Swinomish Tribe and located in Indian country or a member-owned smokeshop located in Indian country and licensed by the Tribe." The Trading Post was not owned by the Tribe, and thus the only way it was a "Tribal retailer" under the Contract is if it was licensed by the Tribe. Once the Trading Post lost its license in April 2005, it was no longer a Tribal retailer and the Contract no longer applied to its sales.

**[11]** Although one might think that this would resolve the legal issue for this third period, the Washington statutes complicate matters. Washington's statutory retrocession provisions all provide for retrocession for "Indian retailers." RCW § 82.08.0316 (retail sales tax "does not apply to sales of cigarettes by an Indian retailer during the effective period of a cigarette tax contract"); *id* § 82.12.0316 (use tax "shall not apply in respect to the use of cigarettes sold by an Indian retailer during the effective period of a cigarette tax contract"); *id.* § 82.24.295 (cigarette taxes "do not apply to the sale, use, consumption, handling, possession, or distribution of cigarettes by an Indian retailer during the effective period of a cigarette tax contract"). The definition of "Indian retailer" under the Washington statutes sweeps more broadly than the definition of "Tribal retailer" under the Swinomish CTC.

For the purpose of all relevant statutory provisions, Washington law defines "Indian retailer" as:

> (i) a retailer wholly owned and operated by an Indian tribe,

> (ii) a business wholly owned and operated by a tribal member and licensed by the tribe, or

(iii)   a business owned and operated by the Indian person or persons in whose name the land is held in trust[.]

*Id.* § 43.06.455(14)(b). Although the first two definitions match the Swinomish CTC, the third definition is not in the Swinomish CTC. Defendants argue that they qualify as an "Indian retailer" under this third definition, and that the state has retroceded from its cigarette tax as applied to them regardless of whether they are a "Tribal retailer" under the Swinomish CTC. The government contends, on the other hand, that we should read the statutory definition of "Indian retailer" as authorizing the Governor to enter into CTCs defining "Indian" or "Tribal" retailer as including all three, or fewer than all three, of these definitions, and limiting the state's retrocession to only retailers as defined in the relevant CTC.

**[12]** We agree with the government. The definition of "Indian retailer" is phrased in the disjunctive. "Indian retailer" is defined as a retailer "owned and operated by an Indian tribe," a retailer "owned and operated by a tribal member and licensed by the tribe," *or* "a business owned and operated by the Indian person or persons in whose name the land is held in trust." *Id.* In negotiating a CTC, the Governor and the tribe have the option of deciding which of these definitions to incorporate. In the Swinomish CTC, they chose to incorporate only the first two.

This interpretation comports with Washington's purpose in enacting the CTC scheme, which was both "to further the government-to-government relationship between the state of Washington and Indians," and to "enhance enforcement of the state's cigarette tax law." *Id.* § 43.06.450. Under this interpretation, so long as the Indian retailer had a tobacco license from the tribe, the state would retrocede its cigarette taxes, leaving enforcement to the tribe. This would give the tribe independence over its law enforcement, part of the

"government-to-government" relationship envisioned by the CTC scheme. If, however, a tribe found that a certain business, like the Trading Post, was so intransigent that the tribe could not enforce its laws, it could revoke or refuse to renew the tribal license. Revocation or expiration of the license would remove the business from the protection of the CTC and subject it to state, and potentially federal, enforcement. The ability to revoke or refuse to renew a license, and thereby trigger state or federal enforcement, ensures that the enforcement of state and tribal cigarette tax law is not undermined by a lack of tribal enforcement capacity.

Though not enacted until after termination of the Wilburs' charged conduct, RCW § 82.24.020(5) provides additional support for our interpretation. RCW § 82.24.020(5) makes explicit the intent of the Washington legislature that where the state "enters into a cigarette tax contract or agreement with a federally recognized Indian tribe . . . , the terms of the contract or agreement take precedence over any conflicting provisions of this chapter while the contract or agreement is in effect." If the cigarette tax contract includes a definition of "tribal retailer" that is narrower than the statutory definition of "Indian retailer," the narrower definition controls. *State v. Comenout*, 267 P.3d 355, 358 (Wash. 2011) (en banc).

[13] We therefore conclude that the state did not retrocede its taxes during the third period. During this period, the Defendants' actions violated the CCTA.

### 4.   Implications for Indictment and Conviction

The only charge in the indictment to which Defendants pled guilty was one continuous conspiracy to violate the CCTA stretching from 1999 through 2007. Based on our interpretation of the CCTA and the relevant Washington laws, there is a gap in the middle of that period during which Defendants' actions did not violate the CCTA. Two issues arise concerning the implications of this gap. First, we must

determine whether, based on the gap, Defendants actually committed two separate conspiracies rather than one continuous conspiracy and, if so, whether prosecution for the first conspiracy is barred by the statute of limitations. Second, we must determine whether the gap creates a variance or constructive amendment of the indictment such that the conspiracy charge should be dismissed in its entirety.

a.    Multiple Conspiracies and the Statute of Limitations

Defendants argue that, based on the gap in the conspiracy, they actually committed two separate conspiracies rather than one continuous conspiracy. Defendants therefore argue that prosecution for the first conspiracy is barred by the statute of limitations. We agree.

**[14]** Actions that cannot be prosecuted because of the statute of limitations can be considered as part of an ongoing conspiracy so long as one overt act in furtherance of the conspiracy occurred during the limitations period. *See United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000). The question here is whether the Wilburs' conspiracy ran continuously from 1999 through 2007, or whether the Wilburs engaged in two separate conspiracies, one before the Swinomish CTC went into effect from 1999 through 2003, and the other after their Swinomish tobacco license expired in 2005.

**[15]** The general rule is that a "conspiracy continues until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy." *United States v. Recio*, 371 F.3d 1093, 1096 (9th Cir. 2004) (internal quotation marks omitted). There are relatively few cases in which defendants have argued that gaps in their activity demonstrated abandonment or withdrawal from the conspiracy such that the government was required to charge two separate conspiracies. *See, e.g.*, *United States v. Krasn*, 614 F.2d 1229 (9th Cir. 1980); *United States v. Payne*, 635 F.2d 643 (7th Cir.

1980); *Continental Baking Co. v. United States*, 281 F.2d 137 (6th Cir. 1960).

The most similar case to the one before us is *Continental Baking*, decided by the Sixth Circuit. The government indicted the Continental Baking Company for a continuous conspiracy based on the "fixing and stabilization of uniform and non-competitive prices of bakery products in the Memphis, Tennessee area." 281 F.2d at 141. For a period of slightly over two years in the middle of the alleged conspiracy, however, the Director of the Office of Price Stabilization set a price ceiling on bakery products. *Id.* at 154. Defendants argued that this "terminated any conspiracy entered into prior thereto, and therefore any continuing conspiracy necessarily began as of the termination of the governmental control." *Id.* The Sixth Circuit rejected this argument, concluding that "[e]ven if the price freeze were to be considered as interrupting an existing conspiracy, if the conspiracy were resumed upon the termination of the price freeze, the intervening period is more properly characterized as a period of suspension of activities rather than a termination resulting in two separate conspiracies." *Id.* We adopted the Sixth Circuit's reasoning in a case with very similar facts. *Krasn*, 614 F.2d at 1236.

**[16]** We conclude that *Continental Baking* and *Krasn* are distinguishable. In this case, there was "affirmative evidence" that there was a "termination" rather than a "suspension" of the conspiracy during the 2003-2005 period. In *Continental Baking*, the legal change that interrupted the conspiracy did not affect the legality of what the defendants were conspiring to do. Rather, by establishing a fixed price ceiling, the legal change made it impossible for them to achieve their object. In this case, however, the signing of the Swinomish CTC and subsequent state retrocession of its cigarette taxes did not prevent the Wilburs from achieving their object. Rather, it made the pursuit of that object legal under federal law. During the two years in which the Swinomish CTC was in effect and the

Trading Post had its Swinomish tobacco license, the Wilburs could not have conspired to violate the CCTA because the purpose of their alleged conspiracy, to sell tax-free cigarettes, did not violate the CCTA. The Wilburs may have been engaged in a conspiracy to violate tribal law, but a violation of tribal cigarette tax law is not criminalized by the CCTA. We therefore conclude that the fact that the Wilburs could achieve their desired end without violating the CCTA during the second period is "affirmative evidence" that the Wilburs terminated their conspiracy during the period in which the Swinomish CTC was in effect and they possessed a Swinom-ish tobacco license.

**[17]** No overt act in furtherance of the conspiracy ending in 2003 occurred within the five-year statute of limitations for CCTA offenses. The government argues that the Wilburs waived a statute of limitations defense by not raising it in the district court. The statute of limitations is an affirmative defense and, generally, is waived if not raised in the trial court. *See United States v. LeMaux*, 994 F.2d 684, 689 (9th Cir. 1993). However, a defendant's failure to raise a statute of limitations defense in the trial court does not result in waiver if raising the defense would have been futile. *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995). Defendants were charged in the indictment with a single continuing con-spiracy, the last overt act of which occurred in 2007, well within the five-year statute of limitations period. Because there was no available statute of limitations defense to the conspiracy charged, to which they conditionally pled guilty, the Wilburs have not waived the defense. Prosecution for the first conspiracy, between 1999 and 2003, is barred by the stat-ute of limitations. The conviction in the second conspiracy, between 2005 and 2007, the period after the Trading Post's tobacco license was revoked, is valid.

### b.   Constructive Amendment and Variance

**[18]** Constructive amendment and variance are based on the "rule that after an indictment has been returned its charges

may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). A constructive amendment of an indictment "occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006) (internal quotation marks omitted). A variance "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* (internal quotation marks omitted). The distinction is important because a constructive amendment always requires reversal, whereas a variance only requires reversal if it prejudices the defendant's substantial rights. *Id.*

**[19]** We conclude that neither of these doctrines applies. Courts find "a constructive amendment where there is a complex of facts distinctly different from those set forth in the charging instrument." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984) (internal quotation marks omitted). Constructive amendment does not apply in this case because no facts are in dispute, and the government has not offered proof of facts different from those set forth in the indictment. The only issue is the legal consequence of the undisputed facts.

Further, constructive amendment only applies to the broadening, rather than the narrowing, of indictments. In *United States v. Miller*, the Supreme Court rejected a claim of constructive amendment where the complaint was "not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary." 471 U.S. 130, 140 (1985). In that case, Miller was indicted for various fraudulent acts in connection with a burglary at his place of business. *Id.* at 131. Proof at trial concerned only one of the many alleged fraudulent acts. *Id.* at 132. The Court specifically rejected the argument that "it constitutes an unconstitutional amendment to drop from an indict-

ment those allegations that are unnecessary to an offense that is clearly contained within it." *Id.* at 144.

In *Miller*, the Court relied on its earlier decision in *Ford v. United States*, 273 U.S. 593 (1927). In that case, the defendant was charged with conspiring to import liquor to the United States in violation of both federal law and a treaty. 273 U.S. at 601. The treaty, however, created no offense against the United States, and thus the conspiracy charge based on the treaty could not be sustained. *Id.* at 602. The Court held that ignoring the treaty charge did not constitute an improper amendment of the indictment. It held that the constructive striking out of the part of the indictment involving the treaty "is merely a judicial holding that a useless averment is innocuous and may be ignored." *Id.* These cases indicate that our conclusion that there was no conspiracy during the period of 2003 to 2005 does not require us to hold that there was an impermissible constructive amendment of the indictment, because the conviction is narrower, rather than broader, than the indictment.

Variance contemplates a difference between the "evidence offered at trial" and the facts "alleged in the indictment." *Hartz*, 458 F.3d at 1020. Like constructive amendment, variance does not apply in this case because the facts are not disputed. There is a possible argument that variance applies because the legal consequence of the facts alleged is different from the legal consequence alleged in the indictment. Based on the facts alleged, the indictment charged a single continuous conspiracy. As discussed above, we conclude that the facts show two separate conspiracies with a gap between them. If variance did apply, Defendants' substantial rights arguably would be prejudiced if we were to find that Defendants waived a statute of limitations defense as to the first conspiracy spanning the years 1999 to 2003. However, because we find the defense has not been waived, we need not reach that question.

## B. Due Process

Defendants argue that their indictment violates due process because the tax law underlying the indictment was not clearly settled. Defendants contend that Washington's cigarette taxing regime is unsettled and extremely complicated, especially as it applies to Indian Tribes under a CTC. Defendants ask us to take note of the rule that a criminal prosecution "is an inappropriate vehicle for pioneering interpretations of tax law." *United States v. Dahlstrom*, 713 F.2d 1423, 1428 (9th Cir. 1983) (internal quotation marks omitted). As this opinion has likely demonstrated, Defendants are correct in their contention that the law is unsettled and complicated. We nonetheless reject Defendants' due process argument.

**[20]** First, the rule that tax laws must be settled in order to form the basis of a criminal prosecution is based on the requirement that criminal violations of the tax law be made "willfully." *See, e.g.*, 26 U.S.C. § 7206(1)-(2). Such violations must therefore involve "a voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12 (1976); *see also Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (willfully means with "a purpose to disobey the law")*; Dahlstrom*, 713 F.2d at 1428. All of the cases on which Defendants rely, including the Fourth Circuit's decision in *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974), involved criminal prosecutions for willfully evading federal income taxes. We held in *Baker* that, unlike criminal income tax violations, the CCTA "does not . . . require knowledge that the actions engaged in violate the law." 63 F.3d at 1491. Defendants agreed in their plea agreements that the mens rea set forth in *Baker* controls for the CCTA, and that the "offense of trafficking in contraband cigarettes is a general intent crime." Because the CCTA does not require knowledge by the Wilburs that their actions were illegal, the due process argument available in prosecutions of federal income tax violations does not apply.

**[21]** Second, we have already rejected a due process chal-
lenge based on the complexity of the interaction between the
CCTA and Washington's taxation and regulation of ciga-
rettes. *Baker*, 63 F.3d at 1492. We held in *Baker* that "[t]he
interaction between the CCTA and Washington's tax scheme
. . . does not involve a complex regulatory scheme with the
potential of trapping unwary merchants trading in cigarettes."
*Id.* We further held that "knowledge of cigarette taxing
requirements can be presumed among those who deal in ciga-
rettes in quantities exceeding 60,000." *Id.* Although *Baker* did
not involve a CTC, which adds significant complexity and
uncertainty to this case, the Wilburs made no argument con-
cerning why *Baker*'s presumption of knowledge of cigarette
taxing requirements for large-scale retailers should not apply
to them, or how they have overcome the presumption. Indeed,
far from arguing that the presumption for large-scale retailers
does not apply to them, Defendants acknowledged this pre-
sumption in their plea agreements.

## C.   State Enforcement Power

Defendants' final argument is that Washington does not
have the power to enforce its tax laws against them, either
because the taxes violate the Treaty at Point Elliott, or
because Washington lacks such power under its own state
law.

### 1.   Treaty at Point Elliott

"A federal statute of general applicability that is silent on
the issue of applicability to Indian tribes will not apply to
them if . . . the application of the law to the tribe would abro-
gate rights guaranteed by Indian treaties." *Baker*, 63 F.3d at
1485 (internal quotation marks omitted). The CCTA is a fed-
eral law of general applicability. *Id.* at 1484-85. Defendants
argue that the Swinomish Tribe reserved the right to trade cig-
arettes free from taxation at the time the Tribe signed the

Treaty at Point Elliott in 1855. The Treaty contains only one clause related to trade:

> The said tribes and bands further agree not to trade at Vancouver's Island or elsewhere out of the dominions of the United States, nor shall foreign Indians be permitted to reside in their reservations without consent of the superintendent or agent.

Because rights not explicitly abrogated in a treaty are presumed to have been reserved by the tribe, *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 195-96 (1999), Defendants argue that if the Swinomish had a right to trade in tobacco at the time of the Treaty, they retain that right today.

Defendants introduced the testimony of Dr. Daniel Boxberger concerning trading activities of the Swinomish in the mid-nineteenth century. Dr. Boxberger's testimony was the only evidence on this issue. Based on his testimony, the district court made the following findings of fact:

1. Dr. Boxberger is the Chair of the Department of Anthropology at Western Washington University and has an expertise in the area of the economics of native peoples in Washington at the time of treaties in the Nineteenth Century.

2. The native peoples who were the ancestors of the Swinomish Tribe resided along the Puget Sound. For the sake of simplicity the Court refers to all such peoples as Swinomish.

3. Dr. Boxberger has studied the culture and history of the Swinomish and has an extensive knowledge of the negotiations of the Treaty at Point Elliott.

4. The Swinomish were actively engaged in trade at the time of Treaty in 1855.

5. The Swinomish traded at many trading posts with the Hudson's Bay Company throughout the Puget Sound area and at Vancouver's Island.

6. The Swinomish traded furs and other goods.

7. This trade was important to the Swinomish.

8. Tobacco was a form of currency in the mid-Nineteenth Century.

9. The Hudson's Bay Company traded tobacco for furs with the Swinomish.

10. The Swinomish traded tobacco for other goods with Indians and non-Indians.

11. At the time of Treaty there were no excise taxes.

12. The Swinomish neither paid nor collected taxes as part of their trade at the time of Treaty.

13. The Swinomish signatories did not understand the Treaty at Point Elliott as restricting their trading practices.

14. Neither the Swinomish nor the United States negotiators anticipated any taxation on the trade of goods at the time of Treaty.

15. The State of Washington did not exist in 1855.

The district court concluded from these factual findings that "the Swinomish signatories to the Treaty at Point Elliott

would not have intended to submit to be restricted in their trade in tobacco or other tribal products."

The district court concluded, however, that the application of the CCTA to Defendants "does not infringe on the rights reserved in the Treaty at Point Elliott" because the state taxes and the CCTA are not a restriction on their tobacco trade. The district court primarily relied on our decision in *Baker*. *Baker* involved the question of whether the Medicine Creek Treaty of 1854 made the CCTA inapplicable to the Puyallup Tribe. *Baker*, 63 F.3d at 1485. The Medicine Creek Treaty was nearly identical to the Treaty at Point Elliott in relevant respects. The only restriction on trade provided: "The said tribes and bands finally agree not to trade at Vancouver's Island, or elsewhere out of the dominions of the United States." *Id.* We assumed in *Baker* that the parties to the Medicine Creek Treaty "intended no other restrictions on Indian trade." We concluded, however, that the CCTA "is not an impermissible restriction on a trading right guaranteed by the Treaty." *Id.* We held that "the CCTA does not restrict trading in cigarettes; it makes it a crime to fail to pay applicable state taxes on cigarettes subject to tax." *Id.*

Defendants argue, correctly, that we "must interpret a treaty right in light of the particular tribe's understanding of that right at the time the treaty was made." *Smiskin*, 487 F.3d at 1267. However, in this case the district court's conclusion that the Swinomish "would not have intended to submit to be restricted in their trade in tobacco" is nearly identical to our assumption in *Baker* that the Puyallup "intended no . . . restriction on Indian trade" other than their agreement not to trade "at Vancouver's Island." In *Baker*, we held that criminalizing the "fail[ure] to pay applicable state taxes on cigarettes subject to tax" does not restrict trading in cigarettes. This holding applies as much to the Swinomish as it applied to the Puyallup, for Defendants have suggested no reason that the tax on cigarettes is a greater restriction on the Swinomish than it was on the Puyallup.

Defendants also note that in *Smiskin* we distinguished *Baker*, holding that the pre-notification requirement for the transport of unstamped cigarettes violated the Yakama Treaty of 1855. *Smiskin*, 487 F.3d at 1267-68. We conclude that Defendants' case is much closer to *Baker* than to *Smiskin*. In *Smiskin*, the Yakama Treaty provided that the Yakamas had "the right, in common with citizens of the United States, to travel upon all public highways." *Id.* at 1262 n.1. In a previous opinion, we had held that the Yakama Treaty prohibited the state from issuing citations to Yakama truck drivers employed by Yakama logging companies. *Cree v. Flores*, 157 F.3d 762 (9th Cir. 1998). *Cree* found that "travel was of great importance to the Yakamas, that they enjoyed free access to travel routes for trade and other purposes at Treaty time, and that they understood the Treaty to grant them valuable rights that would permit them to continue in their ways." *Smiskin*, 487 F.3d at 1265 (quoting *Cree*, 157 F.3d at 769). We therefore concluded that the Treaty "must be interpreted to guarantee the Yakamas the right to transport goods to market over public highways without payment of fees for that use." *Id.* (quoting *Cree*, 157 F.3d at 769). In *Smiskin*, we extended that holding to the pre-notification requirement. We distinguished *Baker* because the Medicine Creek Treaty "did not expressly grant any right to the Puyallup Tribe," and noted that the "ambiguous treaty language stands in stark contrast to the text of the Yakama Treaty." *Id.* at 1267.

**[22]** Because of the similarity of the Treaty at Point Elliott at issue in this case to the Medicine Creek Treaty at issue in *Baker*, and because Defendants have given no reason why the tax is a greater restriction on the Swinomish than it was on the Puyallup, we reject Defendants' treaty argument.

### 2.   State Power to Enforce Tax

Defendants also argue that the "state of Washington lacks jurisdiction to enforce [state cigarette taxes] against reservation Indian[s]." We disagree. As a matter of federal law, the

Supreme Court held in *Colville* "that the State may validly require the tribal smokeshops to affix tax stamps purchased from the State to individual packages of cigarettes prior to the time of sale to nonmembers of the Tribe." 447 U.S. at 159.

**[23]** Defendants suggest that Washington state law somehow deprives Washington of the authority to apply its cigarette taxes to Indian sales to non-Indians. As the district court noted, however, the very state cases cited by Defendants explicitly recognize and endorse *Colville*, and recognize state authority to tax on-reservation sales of cigarettes to non-Indians. *See Bercier v. Kiga*, 103 P.3d 232, 237 (Wash. App. 2004) ("*Colville* . . . allows state taxation of non-Indians and nonmember Indians on reservations where tribal members are exempt from taxation."); *Matheson v. Washington State Liquor Control Bd.*, 130 P.3d 897, 900 (Wash. App. 2006) ("[N]on-Indians and non-tribal Indians, those not enrolled with the tribe where they are doing business, must pay tax on cigarette retail sales on reservations."). We recently affirmed the continuing validity of *Colville* in *Confederated Tribes and Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078 (9th Cir. 2011).

## Conclusion

**[24]** We hold that Washington law has retroceded all of its cigarette taxes for all transactions that are covered by an effective cigarette tax contract. For such transactions, there are no "applicable State or local cigarette taxes," and there is thus no violation of the CCTA. The Wilburs' activities during the period in which the Swinomish CTC was in effect and the Trading Post had a Swinomish tobacco license therefore did not violate the CCTA.

We further hold that because the Wilburs' actions did not violate the CCTA once the Swinomish CTC went into effect and for so long as they had a Swinomish tobacco license, the Wilburs terminated the first conspiracy to violate the CCTA

in 2003. The conviction for their illegal activity that took place between 1999 and 2003 must therefore be set aside as barred by the statute of limitations.

We affirm Defendants' conviction for the second conspiracy to violate the CCTA between 2005 and 2007. The indictment supporting this conviction did not violate due process. Further, neither the Treaty at Point Elliott nor Washington law deprive Washington of the power to enforce its cigarette tax laws against Defendants.

**[25]** We therefore affirm in part and reverse in part. We remand for resentencing based solely on Defendants' conviction for actions during the period between the expiration of their Swinomish tobacco license and the raid on the Trading Post.

**AFFIRMED in part; REVERSED in part; and REMANDED.**

---

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree that there was no violation of the defendants' due process rights when the government indicted and prosecuted the defendants for violations of the Contraband Cigarette Trafficking Act (CCTA). *See United States v. Baker*, 63 F.3d 1478, 1492 (9th Cir. 1995).

I also agree that neither the Treaty at Point Elliott nor any Washington law deprives the State of Washington of its inherent power to enforce its cigarette tax laws against the defendants. *See id.* at 1485 (interpreting a similar treaty provision and concluding that the CCTA did not impermissibly restrict tribal trading); *see also Matheson v. Wash. State Liquor Control Bd.*, 130 P.3d 897, 900 (Wash. App. 2006) (preserving

the State of Washington's right to collect taxes on cigarette sales under state law).

Although there is much on which we agree, on two points I specifically and distinctly part company with the majority. First, it is unquestioned that the defendants failed to even mention the statute of limitations in the proceedings before the district court, including in the plea agreements. Indeed, the only issue reserved for appeal was the defendant's due process claim. Because the statute of limitations is an affirmative defense, the defendants' failure to raise the issue in district court and/or preserve it for appeal in their plea agreements constitutes a waiver. *See United States v. Akmakjian*, 647 F.2d 12, 14 (9th Cir. 1981) ("The Supreme Court has held that the statute of limitations is an affirmative defense that is waived unless raised at trial. . . .") (citations omitted); *see also United States v. Littlefield*, 105 F.3d 527, 528 (9th Cir. 1997) (holding that the defendant's guilty plea foreclosed any subsequent statute of limitations argument).[1]

---

[1]The majority implies that it would have been futile for the Wilburs to raise a statute of limitations argument. However, the case cited by the majority in support of that premise, *United States v. Manning*, 56 F.3d 1188 (9th Cir. 1995), is inapposite. In *Manning*, the defendant was charged with a violation of 18 U.S.C. § 1716, which proscribes murder by a mail bomb. *See id*. at 1193. At the time of his indictment, violation of § 1716 was a capital offense, with no statute of limitations. *See id*. at 1195. When we subsequently held that punishing offenses under § 1716 as a capital crime was unconstitutional, the five-year statute of limitations became applicable. *See id*. Because no statute of limitations applied to a violation of § 1716 when it was a capital offense, there was no statute of limitations defense to waive. *See id*. Unlike in *Manning*, a statute of limitations has always been in effect for the Wilburs. Therefore, the futility reasoning from *Manning* does not apply. The reasoning would apply if no statute of limitations existed for the CCTA when the conspiracy began, but a statute of limitations was later imposed, as in *Manning*. However, those are not the facts of this case. The unusual facts presented in *Manning* simply do not support the majority's attempt to import *Manning*'s limited holding into the strikingly different facts of this case.

The majority opinion divides the charged conspiracy into three periods: the period from 1999 to 2003, before the cigarette tax contract (CTC) between the State of Washington and the Swinomish Tribe was signed; the period from October, 2003, to March, 2005, when the CTC was in effect and the Defendants were selling cigarettes pursuant to a license issued by the Swinomish Tribe; and the period from April, 2005, to May, 2007, when the CTC was in effect, but the Defendants were not operating pursuant to a license issued by the Tribe. *See Majority Opinion*, p. 3730. According to the majority, criminal charges for the first period fall outside the statute of limitations. *See Majority Opinion*, pp. 3730-31.[2] Although the majority acknowledges that because the government alleged a conspiracy beginning in 1999 and continuing through 2007, only one overt act in furtherance of the conspiracy must have occurred during that period, the majority reasons "that there were no state cigarette taxes applicable to the Wilburs" during the period when the CTC was in effect and when the Wilburs were licensed by the Tribe to sell cigarettes. *Majority Opinion*, p. 3731.

I disagree with the majority's reasoning on this point and I agree with the district court that the Wilburs were not entitled to retrocession of the state cigarette taxes that would otherwise be due. It is undisputed that the Wilburs failed to pay to the Tribe the taxes that would otherwise be due to the state. *See* RCW § 43.06.455(3) (providing that the tribal cigarette tax under a CTC was "in lieu of all state cigarette taxes"). But the tribal cigarette taxes were in lieu of state cigarette taxes only to the extent that the cigarette sales conformed to the requirements of the CTC. *See* CTC, ¶ V.6. Paragraph V.1.a of the CTC provided that cigarettes sold by tribal licensees "shall bear a Tribal tax stamp" to signify that tribal taxes had been paid in lieu of the otherwise applicable state cigarette taxes. Cigarettes sold by the Wilburs bore no Tribal tax stamp

---

[2] I reject this premise for the reasons articulated in n.1 above.

because the Wilburs paid no cigarette taxes to the Tribe, despite being licensed by the Tribe under the CTC.

I decline to join the majority's view that the mere existence of the CTC between the State of Washington and the Tribe enabled the Wilburs to completely escape their obligation to pay taxes and thereby realize profits in the millions of dollars at the expense of the Tribe. The express intent of the CTC legislation was that cigarette taxes be paid, not avoided. The majority's interpretation of the Washington law effectuates tax avoidance in contravention of the avowed legislative intent. Indeed, the retrocession language in the statute is explicitly conditioned on the payment of tribal taxes in lieu of the payment of state taxes. The majority's interpretation reads this provision out of the legislation, thereby violating a cardinal principle of statutory construction. *See Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 890 (9th Cir. 2011) (cautioning that statutes should be interpreted to give effect to all provisions).

The majority's analysis then leads into a circuitous and gratuitous discussion addressing the confluence of multiple conspiracies, constructive amendment, variance, and the statute of limitations. *See Majority Opinion*, pp. 3740-44. I do not agree that the majority's analysis reflects the correct approach to resolving this case. As mentioned above, I seriously doubt whether the majority's analysis is even viable under our precedent. *See United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980) ("Krasn asserts that since the alleged error implicates the statute of limitations, it may be raised for the first time on appeal. This is contrary to the rule of this circuit.") (citations omitted). Undeterred, the majority ignores this precedent and proceeds with an analysis anchored in a questionable statute of limitations premise.

In any event, the majority's attempt to distinguish our decision in *United States v. Krasn*, 614 F.2d 1229 (9th Cir. 1980) and the Sixth Circuit's decision in *Continental Baking Co. v.*

*United States*, 281 F.2d 137 (6th Cir. 1960) is singularly unpersuasive.

As a preliminary matter, the majority conducts its analysis as if we were reviewing *de novo*. However, because not even a whiff of a multiple conspiracy argument was raised in the district court, we review for plain error. *See Krasn*, 614 F.2d at 1235. When viewed in this context, there is no intellectually honest way to impute plain error to the district court. This is especially true in view of our practice of recognizing plain error "[o]nly in exceptional situations . . . ." *Id.*

The underpinning of the majority's argument is its reliance on our subsequently overruled conspiracy theory articulated in *United States v. Cruz*, 127 F.3d 791 (9th Cir. 1997). In *Cruz*, we developed the following conspiracy rule: "A conspiracy is deemed to continue until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy.
. . ." *Id.* at 795 (citation and internal quotation marks omitted).

*Cruz* addressed a criminal conviction predicated on a conspiracy to distribute methamphetamine. *See id.* at 794. Before Cruz joined the conspiracy, the drugs that were the object of the conspiracy to distribute were seized by the government and Cruz's co-conspirator was arrested.[3] *See id.* Cruz twice moved for acquittal on the basis that the conspiracy had ended before he became involved. *See id.* at 794-95. After the district court denied Cruz's motions, he appealed. *See id.*

On appeal, the *Cruz* panel applied the aforementioned "conspiracy rule" and held that Cruz could not be prosecuted for participating in the conspiracy. According to the *Cruz* panel, the government's seizure of the drugs terminated the

---

[3]The co-conspirator subsequently cooperated with the government, leading to the arrest of Cruz who, unaware of the seizure, came to retrieve the drugs from the co-conspirator.

conspiracy. Under that rationale, no conspiracy existed when Cruz became involved, and Cruz could not be convicted of the conspiracy charge. *See id.* at 795.

Although the majority does not cite to *Cruz* directly, the quoted language comes directly from *Cruz. See Majority Opinion*, p. 3740 ("The general rule is that a conspiracy continues until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy. . . .") (quoting *United States v. Recio (Recio I)*, 371 F.3d 1093, 1096 (9th Cir. 2004)) (internal quotation marks omitted); *see also Recio I*, 371 F.3d at 1096 (referring to the "*Cruz* conspiracy rule, which held that a conspiracy continues until there is affirmative evidence of abandonment, withdrawal, disavowal, or defeat of the object of the conspiracy") (quoting *Cruz*, 127 F.3d at 795).

It is significant that the majority relies on *Recio* because the United States Supreme Court expressly and explicitly reversed the "*Cruz* conspiracy rule" in *United States v. Recio (Recio II)*, 537 U.S. 270 (2003) to the extent that the rule relies on termination of the conspiracy based on government conduct that defeats the object of the conspiracy. *See id.* at 274 (explaining that a conspiracy does not terminate merely because government action has defeated the object of the conspiracy). This ruling by the Supreme Court eviscerates the majority's contention that the existence of the CTC and licensing by the Tribe terminated the Wilburs' conspiracy to avoid paying the cigarette taxes required by law.

As the Supreme Court noted, the "essence of a conspiracy is an agreement to commit an unlawful act . . . ." *Id.* (citations and internal quotation marks omitted). The agreement to combine for an unlawful cause is "a distinct evil" separate and apart from the substantive crime that is the object of the conspiracy. *Id.* The conspiracy may be the subject of prosecution whether or not the substantive crime is ever consummated. *See id.* Indeed, the Supreme Court took exception to the con-

spiracy termination theory espoused in *Cruz* because a con-
spiracy "decreases the probability" that the co-conspirators
"will depart from their path of criminality." *Id*. at 275 (cita-
tions omitted).

The Supreme Court's expressed concern is exemplified in
this case because the Wilburs never once ceased their criminal
activity. Throughout the existence of the CTC and despite
being licensed by the Tribe, the Wilburs continuously con-
spired to avoid paying the cigarette taxes that were due under
the law.

The cases the majority seeks to distinguish are true to the
Supreme Court's analysis in *Recio II*. Our decision in *Krasn*
involved a conspiracy to engage in price fixing in violation of
the Sherman Act. *See* 614 F.2d at 1231. The conspiracy was
interrupted by a nationwide price freeze. *See id*. at 1232. Fol-
lowing termination of the nationwide price freeze, the price
fixing conspiracy resumed. *See id*. Following his conviction
for conspiracy to violate the Sherman Act, Krasn appealed.
Krasn advanced essentially the same argument espoused by
the majority in this case—that the nationwide price freeze
resulted in an interruption of the conspiracy, thereby resulting
in two separate conspiracies, one before the price freeze and
one after the price freeze. *See id*. at 1236.

We rejected Krasn's multiple conspiracies argument under
the plain error standard of review, the same standard that
applies to the Wilburs' appeal if the issue is not waived.[4] In
*Krasn*, we held that the price freeze was not a dividing line
delineating two separate conspiracies. Rather, because "the
cast of characters to the conspiracy, as well as its purpose,
remained the same in spite of the price freeze," the interven-
ing period when the nationwide price freeze was in effect was
more appropriately characterized" as a period of suspension

---

[4]I maintain that the multiple conspiracies argument was waived as part
and parcel of the statute of limitations waiver. *See* pp. 3753-54 above.

of activities rather than a termination resulting in two separate conspiracies. *Id*. (quoting *Continental Baking Co. v. United States*, 281 F.2d 137, 154 (6th Cir. 1960)).

*Continental Baking*, the case quoted in *Krasn*, also involved a price fixing scheme. *See* 281 F.2d at 141. As in *Krasn*, the price fixing conspiracy was interrupted by the imposition of a nationwide price freeze. *See id.* at 154. As noted in our *Krasn* decision, the Sixth Circuit rejected the argument that the price freeze resulted in termination of the pre-price freeze conspiracy. The Sixth Circuit reasoned that if the conspiracy resumed after the price freeze was no longer in effect, the same conspiracy existed, although the conspiracy may have been dormant during the duration of the price freeze. *See id.* at 154; *see also United States v. Payne*, 635 F.2d 643, 646 (7th Cir. 1980) ("Periods of dormancy could exist between transactions without disrupting or terminating the arrangement . . . .").

The majority seeks to distinguish *Krasn* and *Continental Baking* by asserting that "[i]n this case, there was affirmative evidence that there was a termination rather than a suspension of the conspiracy" during the period when the CTC was in effect and the Wilburs were licensed by the Tribe to sell cigarettes. *Majority Opinion*, p. 3741 (internal quotation marks omitted). The majority also reasons that, in contrast to the price freeze in *Continental Baking*, the CTC legalized the conspiratorial acts of the Wilburs rather than making the object of the conspiracy impossible, as was the case in *Continental Baking*. *See Majority Opinion*, pp. 3741-42. However, this reasoning ignores the Supreme Court's admonition that the object of the conspiracy is not the primary concern underlying conspiracy laws. Rather, the "distinct evil" targeted by conspiracy laws is the concerted action undertaken through agreement of the co-conspirators. *Recio II*, 537 U.S. at 274. The majority's rationale in no way negates the continued agreement of the Wilburs to avoid payment of cigarette taxes. Rather, as we emphasized in *Krasn*, "the cast of characters to

the conspiracy, as well as its purpose remained the same . . . ” 614 F.2d at 1236.

Truth be told, the distinction the majority proffers between this case on the one hand and *Krasn* and *Continental Baking* on the other hand is more semantic than meaningful. Saying that the object of the conspiracy became legal under federal law is the same as saying it was no longer possible for the Wilburs to conspire to violate the law, the same scenario presented in *Krasn* and *Continental Baker*.

Keeping in mind our standard of review, assuming no waiver, it is helpful to articulate precisely what the majority is holding. To conclude that plain error occurred, the error made by the district court must have been so obvious that the court should have been able to avoid it without the error being called to the court’s attention by way of objection. *United States v. Matus-Zayas*, 655 F.3d 1092, 1098 (9th Cir. 2011). The majority holds that, without the benefit of any objection, the district court should have interposed the Wilburs’ statute of limitations defense *and* ruled that there were two separate conspiracies, even though the majority acknowledges that there is no precedent so holding. *See Majority Opinion*, p. 3740. Rather, the majority seeks to explain away precedent to the contrary. *See id*. at p. 3741. This is not the stuff of plain error. *See United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011), *as amended* (“[A]n error cannot be plain where there is no controlling authority on point . . .) (citation and internal quotation marks omitted).

To summarize, because the Wilburs waived any statute of limitations defense and because the conspiracy continued for the entire period alleged in the indictment, I would affirm the convictions on that basis alone. I would not delve into the conjoined multiple conspiracies/statute of limitations/variance/amendment bramble into which the majority ventures. Nevertheless in my view, reliance on the discredited *Cruz* conspiracy termination analysis, the lack of supporting

authority for the majority's multiple conspiracies conclusion and the majority's failure to apply the plain error standard leads the majority to a holding I cannot join. I respectfully dissent.